**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-4204

_____


WILLIAM J. EINHORN,
Administrator of the
TEAMSTERS PENSION TRUST FUND
OF PHILADELPHIA & VICINITY
and the TEAMSTERS HEALTH AND WELFARE
TRUST FUND OF PHILADELPHIA & VICINITY,

Appellant

v.

M.L. RUBERTON CONSTRUCTION COMPANY

v.

RONALD L. TOBIA, ESQ.;
TOBIA & SORGER ESQUIRES, LLC;
DAVID M. DECLEMENT, ESQ.

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 1-06-cv-02511)
District Judge: Honorable Joseph E. Irenas

_____

Argued September 15, 2010

Before: SLOVITER, BARRY, and SMITH, Circuit Judges

(Filed: January 21, 2011)

____

Jo Bennett
Frank C. Sabatino (Argued)
Stevens & Lee
Philadelphia, PA l9l03

   Attorneys for Appellant

Melissa C. Angeline
Lawren H. Briscoe
Jonathan Landesman (Argued)
George E. Pallas
Cohen, Seglias, Pallas, Greenhall & Furman
Philadelphia, PA 19103

   Attorneys for Appellee M.L. Ruberton Construction Company

David M. Kupfer  (Argued)
Carroll, McNulty & Kull
Basking Ridge, NJ 07040

   Attorney for Appellee Ronald L. Tobia, Esq.

———

OPINION OF THE COURT

———

SLOVITER, *Circuit Judge*.

   This appeal asks us to consider the circumstances in which a purchaser of assets bears liability for delinquent employee benefit fund contributions under the Employee Retirement Income Security Act ("ERISA") as a successor in interest to the seller of those assets.  Appellant William J. Einhorn, on behalf of employee benefit funds established pursuant to ERISA, brought suit to recover unpaid contributions from Appellee M.L. Ruberton Construction Company. According to Einhorn, Ruberton was obligated to contribute to the benefit funds under two collective bargaining agreements as a successor employer to the original signatory, Statewide Hi-

2

Way Safety, Inc. The District Court applied the traditional common law rule of successorship liability, found that Ruberton was not a continuation of Statewide, and granted Ruberton's motion for summary judgment. Einhorn appeals.[1]

## I.

Einhorn is the Administrator of the Teamsters Pension Trust Fund and Welfare Fund of Philadelphia and Vicinity (collectively, "the Funds"). The Funds are multiemployer benefit plans established pursuant to various provisions of ERISA, 29 U.S.C. § 1001 *et seq.*, and Section 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5).

Statewide, a highway construction company with facilities in New Jersey, plays an integral role in the dispute, although it is not a party to this lawsuit. Under two collective bargaining agreements ("CBAs") with Teamsters Local Union No. 676, Statewide was required to make contributions to the Funds.

In 2005, Statewide faced a series of financial hardships and the prospect of being debarred from public contract work in New Jersey based on allegations of fraud. Meanwhile, the Funds began an audit of Statewide's payroll records, which revealed delinquencies owed under the aforementioned CBAs. The delinquencies, including liquidated damages, totaled close to $600,000.

Around this time Ruberton, a general construction company, learned of Statewide's financial difficulties and entered into negotiations with Statewide for Ruberton's purchase of Statewide's assets. Local 676 learned of the potential transaction and filed suit for an injunction because it feared that

---

[1] We set forth only those facts that are relevant to our holding. As discussed below, because we will remand this case to the District Court to resolve disputed issues with respect to Ruberton's continuation of Statewide's business, we need not go into great detail here.

Ruberton, a non-union employer, would not agree to become party to Statewide's CBAs. The District Court issued a temporary restraining order ("TRO") enjoining consummation of the sale. Soon after the TRO was issued, negotiations began among Local 676, Statewide, and Ruberton, this time with the union's rights represented.

At the first meeting, Einhorn discussed Statewide's delinquent contributions to the Funds with Statewide's Principal Officer George Smith Jr. and Ruberton's President Andrew Berenato. Berenato testified that at that meeting he heard Einhorn tell Smith that Statewide owed the Funds "about a half a million dollars." App. at 169. Some days later, there was a second meeting among the same individuals.

According to Berenato, Ruberton's principal objective during the second meeting, since they "knew there was a problem with Statewide and the Funds," was to ensure that Ruberton "would not be held the successor to them and liable for that debt." App. at 166. For his part, Einhorn aimed to protect the Funds' interest in delinquent and future contributions. Local 676 sought to ensure that Ruberton would hire its workers hitherto employed by Statewide, rather than continuing to use non-union workers. By the end of this meeting, two agreements were executed.

The first agreement, between Local 676 and Statewide, guaranteed that the union would dismiss the injunction suit without prejudice, and Statewide promised to cooperate fully with the Funds' payroll audit and to timely remit all future contributions. The second agreement, between Local 676 and Ruberton, provided that Ruberton would hire, subject to its work needs, the existing workforce of Statewide covered by the existing CBA, that such employment would be governed by that CBA on an interim basis, and a newly negotiated CBA would cover all Ruberton employees. Neither agreement addressed Ruberton's potential successor liability to the Funds for the delinquent contributions.[2]

_____

[2] The only liability of Statewide's that Ruberton expressly assumed during the sale was an outstanding balance of $160,000

4

Four days after the second meeting, on October 10, 2005, Statewide sold its assets to Ruberton for $1.6 million in cash.[3] Ruberton began making contributions to the Funds in December that year. Simultaneous with the sale, a real estate holding company related to Ruberton, RAL Real Estate, L.L.C., leased Statewide's facility in Folsom, New Jersey. Under the lease agreement another entity related to Ruberton, Brianna L.L.C., thereafter exercised its option to purchase the facility from Statewide and leased the facility to Ruberton. Ruberton hired more than half of Statewide's former employees in the months following the sale, including its Vice President and thirty-three percent shareholder, and took over several of Statewide's projects. Approximately two months after the sale, Ruberton auctioned off many of the assets it had purchased from Statewide that were not used in the expanded operations, realizing just more than $600,000.

Statewide remained in business for some time after the asset sale using subcontractors to provide the necessary equipment and labor. Ruberton was one such subcontractor, billing Statewide more than $400,000 for rented employees and equipment. In January 2006, Statewide ceased all field operations. A shareholder from Statewide retained an office at the site now occupied by Ruberton to wind down the business. Ruberton's profits increased as a result of the sale and the company is still engaged in the highway construction business.

On December 13, 2005, Einhorn filed an action against Statewide and Ruberton. Einhorn alleged that Statewide owed the Funds pursuant to the operative CBAs and that Ruberton owed the Funds as a successor in interest to Statewide. The

---

that Statewide owed on some heavy equipment.

[3] Such assets included office equipment, furnishings and fixtures, machinery, vehicles, construction equipment, access to all sales and business records and information, access to Statewide's telephone/facsimile numbers, rights under all leases for equipment, permits, licenses, franchises, etc., and Statewide's inventory. Statewide kept its accounts receivable, which amounted to more than $5 million.

parties reached a settlement agreement on March 16, 2006, wherein Statewide agreed to pay the delinquent contributions in a series of installments. Statewide breached the settlement agreement and Einhorn filed the present action against Ruberton in June 2006.[4] The following week, Einhorn obtained a judgment against Statewide in the prior suit for the breach, which Einhorn has been unable to enforce.[5]

## II.

The District Court had jurisdiction under 29 U.S.C. §§ 1132, 185(a), as well as 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291.[6]

We exercise *de novo* review of the District Court's resolution of the parties' cross motions for summary judgment. *See Startzell v. City of Phila.*, 533 F.3d 183, 192 (3d Cir. 2008). Similarly, we exercise plenary review over the District Court's "choice and interpretation of legal precepts." *Am. Soc'y for Testing v. Corrpro Cos., Inc.*, 478 F.3d 557, 566 (3d Cir. 2007) (citation and quotations omitted).

## III.

At issue in this appeal is whether Ruberton may be held liable for Statewide's debts to the Funds under a theory of

---

[4] During the proceedings, Ruberton filed a third-party complaint against its former counsel Ronald L. Tobia and David M. DeClement alleging malpractice. The District Court stayed the third-party action pending disposition of this appeal.

[5] As noted by the District Court, as of October 2008, Statewide had at least fifteen judgments entered against it and less than $250 in its bank accounts.

[6] The District Court granted Ruberton's motion to certify as a final judgment the summary judgment order under Fed. R. Civ. P. 54(b). In the absence of certification, Ruberton's unresolved legal malpractice claims against its former attorneys would have precluded appealability.

successor liability. It is settled that successor liability may be imposed for delinquent ERISA fund contributions in the context of a merger. *Teamsters Pension Trust Fund of Phila. & Vicinity v. Littlejohn*, 155 F.3d 206, 208-10 (3d Cir. 1998) (holding that under the federal common law, the surviving entity in a merger is liable for the debts of the predecessor regardless of whether the successor had pre-merger notice of such debts). As the District Court found and is undisputed by the parties, however, the transaction between Statewide and Ruberton was not a merger. Rather, the transaction here was one in which a corporate entity bought the assets of another corporate entity. Liability under that situation is not well settled.

At the District Court, both parties assumed that the Seventh Circuit's decision in *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323 (7th Cir. 1990), provided the applicable rule of law in the case. *Artistic Furniture* held that a successor purchaser of assets may be liable for the seller's delinquent ERISA fund contributions to vindicate important federal statutory policy where the buyer had notice of the liability prior to the sale and there was sufficient evidence of "continuity of operations" between the entities. *Id.* at 1327-29. In so holding, the Seventh Circuit departed from the general common law rule that an entity that purchases the assets of another does not assume the seller's liabilities unless one of the following exceptions applies: the purchaser expressly or impliedly assumed liability; the transaction amounted to a de facto merger; the purchasing corporation is a mere continuation of the seller; or the transfer of assets was for the fraudulent purpose of escaping liability for unpaid debts. *Id.* at 1325-26.

The District Court declined to follow the expanded successorship doctrine espoused by the Seventh Circuit in *Artistic Furniture*. Guided by this court's precedents, the District Court distinguished *Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973), upon which the Seventh Circuit relied in *Artistic Furniture*. The District Court interpreted our prior decision in *Littlejohn* to hold that universal concepts of corporate law supplied the federal common law rule of successor liability in the present ERISA case. Because the District Court found that none of the exceptions permitting liability applied, it granted

7

Ruberton's motion for summary judgment.

The Supreme Court has recognized that "striking a balance between the conflicting legitimate interests of the bona fide successor, the public, and the affected employee[s]" to effectuate national labor policy "is often a difficult and delicate responsibility." *Golden State*, 414 U.S. at 181 (citations and quotations omitted); *see also EEOC v. Vucitech*, 842 F.2d 936, 944 (7th Cir. 1988) (noting that successor liability is "dreadfully tangled, reflecting the difficulty of striking the right balance between the competing interests at stake"). While this court appreciates the District Court's efforts to balance the interests, like the Seventh Circuit we "feel constrained to disagree with its ruling that labor law successorship principles cannot support the imposition of liability upon [Ruberton]." *Artistic Furniture*, 920 F.2d at 1325.

Federal courts beginning with *Golden State* have developed a federal common law successorship doctrine imposing liability upon successors beyond the confines of the common law rule when necessary to protect important employment-related policies. *See Brzozowski v. Corr. Physician Servs., Inc.*, 360 F.3d 173, 177 (3d Cir. 2004). In *Golden State*, the Supreme Court held that the purchaser of a business could be held liable under the National Labor Relations Act ("NLRA") for remedying the seller's unlawful discharge of an employee where the successor employer had notice of the unfair practice and "continued, without interruption or substantial change, the predecessor's business operations." 414 U.S. at 184. The remedy required that the successor reinstate the employee with back pay.

The Supreme Court acknowledged in *Golden State* that the successor company "was not party to the unfair labor practices" and now "operate[s] the business without any connection with his predecessor." *Id.* at 171 n.2 (quotations omitted). Nonetheless, it stated, other factors must be taken into account when balancing the equities. Among those equities is that the successor "is generally in the best position to remedy" the violation and, because notice is required, potential liability "can be reflected in the price [the successor] pays for the

8

business, or [the successor] may secure an indemnity clause in the sales contract." *Id.* (quotations omitted). Moreover, throughout its analysis, the Supreme Court emphasized the importance of providing "protection for the victimized employee" without a remedy against the now defunct predecessor entity. *Id.* at 181.

As noted by the Seventh Circuit, *Golden State* laid the foundation for a series of cases in this court and others that expanded successorship liability in the labor field holding that labor policies have superseded the competing interest of fluidity of corporate assets reflected in the common law rule. *Artistic Furniture*, 920 F.2d at 1326-27.[7]

This court, following *Golden State*, has extended the labor law successorship doctrine to employment discrimination claims under Title VII. *See Brzozowski*, 360 F.3d 173; *Rego v. ARC Water Treatment Co. of Pa.*, 181 F.3d 396 (3d Cir. 1999).[8] In *Brzozowski*, the plaintiff brought an action against her former employer alleging gender discrimination that resulted in $150,000 of damages. 360 F.3d at 175-76. When the plaintiff realized that the company was insolvent, she asserted a claim against the successor who had purchased the company's assets.

---

[7] *See, e.g., Steinbach v. Hubbard*, 51 F.3d 843 (9th Cir. 1995) (Fair Labor Standards Act); *Artistic Furniture*, 920 F.2d 1323 (ERISA); *Criswell v. Delta Air Lines, Inc.*, 868 F.2d 1093 (9th Cir. 1989) (Age Discrimination in Employment Act); *Sec'y of Labor v. Mullins*, 888 F.2d 1448 (D.C. Cir. 1989) (Mine Safety and Health Act); *Vucitech*, 842 F.2d 936 (Pregnancy Discrimination Act); *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740 (7th Cir. 1985) (42 U.S.C. § 1981); *Bates v. Pac. Mar. Ass'n*, 744 F.2d 705 (9th Cir. 1984) (Title VII).

[8] Other circuits have extended successor liability to Title VII violations as well. *See, e.g., Rojas v. TK Commc'ns, Inc.*, 87 F.3d 745 (5th Cir. 1996); *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228 (7th Cir. 1986); *In re Nat'l Airlines, Inc.*, 700 F.2d 695 (11th Cir. 1983); *Trujillo v. Longhorn Mfg. Co., Inc.*, 694 F.2d 221 (10th Cir. 1982); *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974).

*Id.*

Taking into consideration the three principal factors applicable to successor liability in the employment discrimination context, we found that imposition of successor liability was appropriate because the successor was on notice, there was sufficient continuity of operations and workforce, and the predecessor was unable to provide adequate relief. *Id.* at 178. We considered the balance of equities and "the prime consideration" of fairness. *Id.* The successor-employer had ample opportunity to insulate itself from liability during the negotiations. Indeed, the sales agreement included an indemnity clause disclaiming the successor's liability for certain law suits and EEOC claims. *Id.* at 175.

Our cases extending successorship liability from the NLRA to the Title VII context suggest important principles. First, we have not confined the theory of successor liability after an asset sale to the NLRA context, but have extended it to other contexts based on the balance of equities. Second, the imposition of a financial burden on the successor employer has not restricted imposition of liability.[9] *See Artistic Furniture*, 920 F.2d at 1327 ("There is, of course, no relevant economic difference between the award of backpay or compensatory damages at issue in our previous successor liability cases and the

---

[9] We realize that here the liability lies close to $1 million. While this is greater than the successor liability imposed in the cases relied upon, this fact alone does not dictate whether liability is fair. In *Golden State*, the successor was required to pay four years of backpay for one employee. 414 U.S. at 187 n.9. If multiple employees had been implicated in unfair labor practices, multi-year salaries could have imposed a hefty sum and nothing in the Supreme Court's analysis would have precluded successor liability for multiple employees so long as there was notice. In *Brzozowski*, the plaintiff claimed $150,000 in damages for just one employee. Here, there are a number of plan beneficiaries who stand to be harmed. The record demonstrates that the asset sale has been lucrative for Ruberton's business. Ruberton's business acumen serves not as a basis for punishment as it asserts, but rather a factor to be taken into account when balancing the equities.

delinquent contribution liability at issue here."). The requirement of notice and the ability of the successor to shield itself during negotiations temper concerns that imposing successor liability might discourage corporate transactions.

We agree with the Seventh Circuit that the federal policies underlying ERISA and the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), Pub.L. 96-364, 94 Stat. 1208, "are no less important, and no less compel the imposition of successor liability than do the policies animating the NLRA, Title VII," or the other statutes to which the doctrine has been extended. *Id.* In light of the Seventh Circuit's comprehensive analysis, we need not reinvent the wheel. Rather, we will address some of the concerns raised by the District Court and summarize the principal considerations that provide our *ratio decidendi*.

A central policy goal underlying ERISA's enactment "was to protect plan participants and their beneficiaries." *Littlejohn*, 155 F.3d at 208; *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983) ("ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans."); *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs*, 580 F.3d 185, 194 (3d Cir. 2009) (ERISA was enacted to ensure "that pension funds will be adequately funded, even when employers withdraw from them, and that employees who are relying on those funds will be protected."); *Becker v. Mack Trucks, Inc.*, 281 F.3d 372, 381 (3d Cir. 2002) ("ERISA is designed to protect benefits promised to an employee arising from a pre-existing employment relationship."). Congress evinced a strong desire to further protect participants when it enacted the MPPAA, which amended ERISA to prevent "the adverse consequences that result when individual employers terminate their participation or withdraw" from multiemployer pension plans. *Supervalu, Inc. v. Bd. of Trs.*, 500 F.3d 334, 336 (3d Cir. 2007) (quotations omitted).

Statewide's failure to pay contributions caused harm to plan beneficiaries and changed the nature of the employment relationship. As the District Court noted during the settlement

11

hearing in January 2006, the Health and Welfare Fund suspended benefits after the sale, leaving fifty-three union workers and, in some cases, their families without health insurance. Absent imposition of successor liability on Ruberton, other employers will be forced to make up the difference to ensure that workers receive their entitled benefits. If these outcomes were permitted, it would contravene congressional policy for multiemployer pension funds. *See Artistic Furniture*, 920 F.2d at 1328 (providing an in depth discussion of the legislative history).

The rule promulgated in *Artistic Furniture* comports with our opinion in *Littlejohn*. As noted above, we held in *Littlejohn* that successor liability for delinquent ERISA fund contributions could be imposed after a merger without notice. In so doing, we relied in part on the "almost universally accepted state law principle that when two corporations merge, the surviving corporation assumes the liabilities of the extinct corporation." *Littlejohn*, 155 F.3d at 209. Because the present case involves an asset sale rather than a merger, the "universally accepted" principle adopted in *Littlejohn* does not directly apply here.

However, *Littlejohn* established a framework by which to determine successor liability under ERISA. As we stated in *Littlejohn*, "where the statute does not provide explicit instructions, it is well settled that Congress intended that the federal courts would fill in the gaps by developing, in light of reason, experience, and common sense, a federal common law of rights and obligations imposed by the statute." *Id.* at 208. "Of course, [we continued,] the federal common law must be developed with ERISA's policy goals in mind." *Id.* Although we relied in *Littlejohn* on the state common law rule of successor liability for delinquent contributions in a merger, we did so stressing that following state law in that context furthered Congress' goals in enacting ERISA. *See id.* at 210 (adopting a general rule of successor liability for mergers "demonstrates not only its basis in reason but also that adopting it in this context will further ERISA's policy goal of protecting employee pension plan participants and their beneficiaries"). We are satisfied that the Seventh Circuit gave proper weight to the policy considerations that we held in *Littlejohn* govern the federal

12

common law of ERISA.

The District Court, and Ruberton on appeal, dwell on language from *Littlejohn* to support a departure from *Artistic Furniture* and the *Golden State* line of cases. In *Littlejohn*, we said that *Golden State* and its progeny were "somewhat distinguishable because they dealt with the application of labor law concepts and the terms of a collective bargaining agreement to a corporation other than the signatory to the agreement," whereas, in *Littlejohn* the issue involved "the transfer of a valid and ordinary debt . . . which just happens to have its genesis in the terms of a collective bargaining agreement." *Id.* at 209. The District Court found that the balance of equities is different in a suit to recover an "ordinary debt" because the unique employer-employee relationship governed by federal labor law and policy is not implicated as it is in an unfair labor practice suit. *Einhorn v. M.L. Ruberton Const. Co.*, 665 F. Supp. 2d 463, 474 (D.N.J. 2009).

We are unpersuaded. *Littlejohn* is weak precedent for the notion that an ERISA debt is merely "ordinary." In that case, "the parties *agree[d]* that only the transfer of a valid and ordinary debt [was] at issue." 155 F.3d at 209 (emphasis added). Thus, the court did not *decide* that an ERISA debt is ordinary; the point was *conceded* and the court assumed it. Neither the *Littlejohn* court nor the District Court offered any further justification for concluding that such a debt is merely contractual.

There is more than a contractual arrangement at stake here. As the *Artistic Furniture* court observed, contribution duties under ERISA are mandated by statute, with a special federal cause of action for their enforcement. 920 F.2d at 1328 (citing 29 U.S.C. §§ 1145, 1132). Congress has thus adopted a policy of protecting ERISA funds against delinquent contributors to a degree that is greater than that afforded by the common law of contracts. This policy judgment alters the pre-existing balance of considerations that led to the adoption of the common law rule, which counsels in favor of expanding successor liability.

13

Moreover, the considerations in *Littlejohn* are distinguishable from the present case. The issue in *Littlejohn* focused on the requirement of notice. This court was concerned that requiring notice before a debt follows in the context of a merger "would result in perverse incentives, encouraging the survivor to *not* examine records and hide its head in the sand," and allow the disappearing entity to "unilaterally extinguish a debt" by hiding it from the survivor. *Id.* at 210 (emphasis in original). In the context of an asset sale, requiring notice would have the opposite effect. The successor-purchaser would have incentive to inquire about the seller's previous liabilities to negotiate for a lower purchase price. The predecessor-seller would have incentive to disclose debts and find workable solutions during the sale to release itself from liability and avoid protracted dispute.

In its brief, Ruberton opines that "it would make little sense for courts . . . to apply a narrow standard for determining successor liability in ERISA cases involving mergers and an expanded standard in cases involving assets sales – unless the goal is to place a 'thumb on the scales' of justice to obtain a particular result." Appellee's Br. at 24. Although we have referred to the *Artistic Furniture* standard as the "expanded" successorship doctrine, this is not entirely accurate. On one hand, the *Artistic Furniture* standard is more expansive than the common law rule of successor liability because it does not require commonality of ownership between the seller and buyer for the continuance analysis (discussed *infra*). On the other, the *Artistic Furniture* standard is narrower than the common law because it requires that a successor be put on notice before the assumption of debt follows. And, as *Littlejohn* instructs, balancing the equities in light of federal labor policy is precisely what we are supposed to do in successorship cases under ERISA. This may, as here, require that different standards apply in different contexts.

The *Artistic Furniture* opinion comports with other precedents of this court. We have recognized that because ERISA and the MPPAA are remedial statutes, they "should be liberally construed in favor of protecting the participants in employee benefit plans." *IUE AFL-CIO Pension Fund v. Barker*

14

*& Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986).
Moreover, as argued by Einhorn, in *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098 (3d Cir. 1996), this court recognized that ERISA displaces traditional common law principles in litigation brought to recover delinquent contributions to multiemployer plans. We held in *McCormick Dray* that the defense of mutual mistake, valid under the traditional common law, was not available in an ERISA suit in order to effectuate federal labor policy as intended by Congress. *Id.* at 1106-07. The principles set forth in *McCormick Dray* support a departure from the common law rule in the present case as well.

The District Court's reliance on our decision in *Polius v. Clark Equip. Co.*, 802 F.2d 75 (3d Cir. 1986), was misplaced. *Polius* involved a state products liability suit and does not govern our analysis in the labor context. Moreover, the notice requirement obviates the concern we expressed in *Polius*, and echoed by the District Court, that expanded liability would be unforeseen and is likely to discourage corporate transactions. As we noted above, we do not agree that imposing liability will negatively affect the liquidity of corporate assets. As the Supreme Court reasoned in *Golden State*, the seller's outstanding liabilities can be reflected in the purchase price, or the successor may secure an indemnity clause in the sales contract. 414 U.S. at 172 n.2.

A number of other circuit and district courts have extended the *Golden State* rationale in actions seeking recovery of delinquent pension fund contributions under ERISA after an asset sale. *See Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 308 (1st Cir. 1998) (citing *Artistic Furniture*, the court recognized that "[a]lthough developed in the labor law context, alter ego or successor liability analysis has been applied to claims involving employee benefit funds brought under ERISA and the LMRA"); *Stotter Div. of Graduate Plastics Co., Inc. v. Dist. 65, United Auto Workers*, 991 F.2d 997, 1002 (2d Cir. 1993) (citing *Artistic Furniture*, the court found that the arbitrator did not exceed his authority by imposing liability on the successor-employer for delinquent contributions owed under the predecessor's CBA

with a union); *Haw. Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289 (9th Cir. 1987) (in wake of an asset sale, the court followed the substantial continuity test for determining successor liability for delinquent contributions); *Bd. of Trs. of Unite Here Local 25 v. MR Watergate LLC*, 677 F. Supp. 2d 229, 231-32 (D.D.C. 2010) (recognizing *Artistic Furniture*); *Cent. Pa. Teamsters Pension Fund v. Bear Distrib. Co. Inc.*, No. 07-CV-3554, 2009 WL 812224, at *8 (E.D. Pa. Mar. 26, 2009) (adopting the *Artistic Furniture* standard in an analogous case); *Trs. of the Utah Carpenters & Cement Masons Pension Trust v. DAW, Inc.*, No. 2:07-CV-87 TC, 2009 WL 77856, at *3 (D. Utah Jan. 7, 2009) (following *Artistic Furniture* finding buyer liable for seller's withdrawal liability under ERISA); s*ee also* 14 Fletcher, Cyc. Corp. § 6755 ("federal courts in the labor law field have taken a far more liberal approach [than the common law] in imposing the obligations of a seller of assets on the purchaser . . . [including] where the predecessor had failed to meet its payment obligations under a multiemployer plan") (citations omitted). No court of appeals, to our knowledge, has rejected the holding in *Artistic Furniture*.[10]

In sum, we hold that a purchaser of assets may be liable for a seller's delinquent ERISA fund contributions to vindicate important federal statutory policy where the buyer had notice of the liability prior to the sale and there exists sufficient evidence of continuity of operations between the buyer and seller. The inquiry should be effectuated on a case by case basis balancing the equities presently before the court.

We will remand this case to the District Court to apply

---

[10] Ruberton cites to cases from the Fifth and Eighth circuits as inconsistent with expanded successorship liability under ERISA. However, neither case provides persuasive or relevant authority. *See Greater Kan. City Laborers Pension Fund v. Superior Gen. Contractors, Inc.*, 104 F.3d 1050 (8th Cir. 1997) (case did not involve an asset sale and issue was whether defendant was an alter ego); *Cen. States, Se. & Sw. Areas Pension Funds v. PYA/Monarch of Tex., Inc.*, 851 F.2d 780 (5th Cir. 1988) (plaintiff sued on narrow grounds under the common law).

the *Golden State* successorship doctrine to determine whether Ruberton is liable for Statewide's delinquencies to the Funds. At oral argument the parties did not dispute that the notice requirement has been satisfied. *Artistic Furniture*, 920 F.2d at 1329 (the notice inquiry centers on whether the buyer knows about the debts, not whether the buyer knows that the funds intend to seek recovery from it). As such, the only issue on remand will be whether Ruberton substantially continued Statewide's operations.

Under the substantial continuity test courts look to, *inter alia*, the following factors: continuity of the workforce, management, equipment and location; completion of work orders begun by the predecessor; and constancy of customers. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987); *Artistic Furniture*, 920 F.2d at 1329. This analysis differs from the traditional common law de facto merger and mere continuation exceptions because commonality of ownership is not required. *See Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 467-69 (3d Cir. 2006) (discussing the factors for determining whether a transaction is a de facto merger or continuation, including continuity of shareholders); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1084 (7th Cir. 1997) ("a purchaser of assets will not be liable under the theory of de facto merger or mere continuation in the absence of continuity of ownership") (quotations omitted).

The parties dispute whether Ruberton continued Statewide's business and, if so, to what extent. For example, Ruberton argues that "even if Ruberton were deemed to have continued Statewide's business, that continuation would be limited to the guide rail, fencing and signage business" covered by the Local 676 CBA and it could not be liable for contributions owed in connection with Statewide's other CBAs. Appellee's Br. at 9 n.4. The presence of a factual dispute renders summary judgment at this juncture for either party inappropriate and this question is best resolved by the District Court.

**IV.**

17

For the reasons set forth, we will vacate the District Court's grant of summary judgment in favor of Ruberton, and remand for further proceedings consistent with this opinion.