NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 15-1380 and 15-1574
_____

SECRETARY OF LABOR

v.

JAMES DOYLE; CYNTHIA HOLLOWAY; MICHAEL GARNETT;
MARK MACCARIELLA; and the PITWU HEALTH & WELFARE FUND


CYNTHIA HOLLOWAY,
Third-Party Plaintiff

v.

MICHAEL GARNETT, MARK MACARIELLA; DAVID WEINSTEIN;
UNION PRIVILEGE CARE, INC; DANTE GEORENO;
FRANK MILITELLO; TIM FOSTER; NEAL GOLDSTEIN and
FREEDMAN & LORRY; and THE MCKEOUGH COMPANY,

Cynthia Holloway,
Appellant in No. 15-1380

James Doyle,
Appellant in No. 15-1574
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(1:05-cv-02264)
District Judge: Honorable Joseph H. Rodriguez
_____

Argued:  January 21, 2016
_____

Before: JORDAN, HARDIMAN, and GREENAWAY, JR., *Circuit Judges*.

(Opinion Filed: August 18, 2016)

Thomas E. Perez, Secretary of Labor
M. Patricia Smith, Solicitor of Labor
G. Williams Scott, Associate Solicitor
Thomas Tso, Counsel for Appellate and Special Litigation
Marcia E. Bove *[ARGUED]*
David Edeli
United States Department of Labor
Office of the Solicitor
Room N-4611
200 Constitution Avenue, N.W.
Washington, DC 20210
    *Attorneys for Appellee*

Rachel J. Gallagher
Steven K. Ludwig *[ARGUED]*
Fox Rothschild
2000 Market Street, 20th Floor
Philadelphia, PA 19103
    *Attorneys for Appellant Cynthia Holloway*

Jill A. Guldin *[ARGUED]*
Lauletta Birnbaum
591 Mantua Boulevard, #200
Sewell, NJ 08080
    *Attorney for Appellant James Doyle*

_____

OPINION[*]
_____

GREENAWAY, JR., *Circuit Judge*.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

This matter returns to the Third Circuit on a consolidated appeal. The District Court found, based on evidence adduced at a bench trial, that Appellants James Doyle and Cynthia Holloway breached their fiduciary duties to the Professional Industrial Trade Workers Union ("PITWU") Health & Welfare Fund ("Fund"), a plan governed by the Employee Retirement Income Security Act ("ERISA"). For the reasons that follow, we will affirm the District Court's judgment as to Doyle, and vacate and remand the District Court's judgment as to Holloway.

## I.    BACKGROUND

### A.    Factual Background

The District Court's full factual findings are set forth in our prior opinion and the District Court's opinion following remand; we need not repeat them in detail here. However, we provide an overview of the facts for context.

Holloway first learned of PITWU from an insurance broker in 2000, after David Weinstein had established PITWU earlier that year. After an attorney provided Holloway with verification of PITWU's union status, she and three other individuals established the Fund on May 1, 2001, as reflected by an Agreement and Declaration of Trust. The Fund operated until May 2003 as a multiple employer welfare arrangement providing health benefits to numerous small employers. Holloway's company, Employers Depot, Inc. ("EDI"), was a member of the Fund from the Fund's inception. EDI was a professional employer organization ("PEO"). Generally, PEOs provide human resources services to client-employers as well as payroll, workers' compensation, and health and retirement

benefits.

The Fund had various third-party administrators who reviewed and paid health claims covered by the Fund, as well as trustees, counsel, and an actuary. The Fund's initial claims administrator was Union Privileged Care ("UPC"), which was owned by Weinstein. Holloway served as one of the original Fund trustees from the Fund's creation until she resigned on September 27, 2002.

Weinstein also owned two PEOs, Privileged Care, Inc. ("PCI") and NorthPoint PEO ("NP"),[1] which became members of the Fund sometime after January 2002 by entering into ostensible collective bargaining agreements ("CBAs") with PITWU.[2] In the CBAs, PCI/NP agreed to contribute to the Fund at specified rates so that their client-employers could receive health benefits under the Fund.

Doyle's company, Privilege Care Marketing Group ("PCMG"), contracted with PCI/NP to market PEO services and access to the Fund to small businesses. Client-employers gained access to the Fund by checking a "health benefit" box and a "union"

---

[1] The District Court concluded that PCI and NP were effectively the same organization in that they shared consultants, office space, owners, and employees. *See Sec'y of Labor v. Doyle*, No. 05-cv-2264, 2014 WL 6747882, at *2 n.2 (D.N.J. Dec. 1, 2014). Therefore, PCI and NP are referred to as "PCI/NP."

[2] As we previously described, the collective bargaining relationship between PCI/NP and PITWU was a "sham" and the CBAs were "bogus" insofar as "they were not the result of bona fide collective bargaining, and the employees [PITWU] enrolled in the union by PCI/Northpoint were not genuine union members." *Sec'y of Labor v. Doyle*, 675 F.3d 187, 197 n.23, 201 (3d Cir. 2012). For example, client-employers never received copies of the CBAs, *see Doyle*, 2014 WL 6747882, at *9 (citing J.A. 726, 744, 796, 967), and several client-employers testified at trial that their employees were not unionized, *id.* at *8.

4

box on enrollment forms, even though their employees did not become members of PITWU. Although enrollment forms listed a number of additional PEO services, the only service consistently offered by PCI/NP was health benefits through the Fund.

When businesses decided to enroll their employees in the Fund (and become client-employers of PCI/NP), Doyle required them to initially pay a single check to PCMG. Thereafter, Doyle required PCI/NP's client-employers to make monthly payments to PCMG via two checks. PCMG remitted the first check ("Check 1") to PCI/NP and retained the second check ("Check 2") as various fees and marketing commissions. PCI/NP retained a portion of Check 1, sent a portion back to PCMG as a "refund," paid a portion to PITWU as "union dues," and sent the remainder to claims administrators.

In January 2002, less than a month after PCI/NP and PCMG became members of the Fund, the Oklahoma Insurance Commissioner entered a cease and desist order against PCI, PCMG, and two of its marketing affiliates. The Commissioner found that they were engaging in the unauthorized sale of insurance and therefore ordered them to cease and desist from any further sales or marketing of insurance in the state.

Weinstein's company, UPC, was replaced as the claims administrator in March 2002. At an April 23, 2002 meeting with the Fund's new claims administrator, Holloway learned of "several boxes" of pending, unpaid claims from member-employees, and of concern that claims may not have been paid since November 2001. J.A. 161–63, 1005–06. Holloway requested a date by which all claims be entered into the Fund's database to determine the magnitude of unpaid or pending claims.

5

Despite Holloway's "general concerns" about Weinstein, Holloway and another trustee appointed Weinstein as a trustee to the Fund. J.A. 1008, 1013.[3] However, at a subsequent trustee meeting held on May 30, 2002, Weinstein resigned as trustee. At this meeting, the Fund's accountant informed the trustees that he could not prepare a financial statement for the Fund because the financial information he had requested from UPC had not yet been provided. The Fund's actuary reported that it had received insufficient information from Weinstein to offer an opinion on whether the Fund was underfunded. The trustees developed a plan with Weinstein to provide all necessary data.[4]

In June 2002, the Louisiana Insurance Commissioner issued a cease and desist order based on its finding that that PCI/NP was selling health insurance without authorization. The Commissioner found that there was no collective bargaining by PITWU on behalf of its members and that client-employers of PCI/NP received no representation or benefit from PITWU other than access to the Fund.[5]

On September 20, 2002, the Fund's new claims administrator informed Holloway

---

[3] Holloway testified that she had "general concerns" regarding the appointment of Weinstein as a trustee for the PITWU Fund but did not elucidate what motivated those concerns; she also testified that she did not research Weinstein's qualifications to be a trustee. *See* J.A. 1009–14.

[4] The trustee meeting minutes indicate that the trustees and PITWU Fund counsel gave Weinstein "specific instructions" regarding the data that he was to provide the new third-party administrator. *See* J.A. 1077–78.

[5] By the time the Fund ceased operations in May 2003, five other states had entered similar cease and desist orders against PCI/NP, the Fund, PCMG, Doyle, and others, arising from the marketing and providing of health care services in the states without the necessary authorization. *See Doyle*, 2014 WL 6747882, at *7.

of problems relating to lack of funding because of PCI/NP's failure to make contributions to the Fund and other problems arising from inadequate paperwork. In a letter dated September 20, 2002, Holloway resigned as trustee. In her letter of resignation, she identified multiple reasons leading to her resignation, including the lack of financial accountability for contributions to the Fund and the resulting lack of funding to pay claims. Holloway also noted that several states had issued cease and desist orders "based on the representation by other membership/trustees that PITWU [was] an insurance program." J.A. 196–97.

PCMG received a total of $2.1 million ($2,107,361) in Check 2 monies, which it retained as marketing commissions and fees. J.A. 417 (Column 15, Row 33).

PCMG also received a total of approximately $4.5 million ($4,497,067, J.A. 417 at Column 13, Row 33) in Check 1 monies. Of this $4.5 million, the District Court determined that, after approximately $197,000 ($196,998, J.A. 424, sum of Columns 8 and 9, Row 20) in refunds/commissions was returned from PCI/NP to PCMG, only a net total of approximately $3.1 million was forwarded by PCMG to PCI/NP. *Doyle*, 2014 WL 6747882, at *15. Of the approximately $1.4 million in Check 1 monies not forwarded to PCI/NP ($4.5 million minus $3.1 million), approximately $645,000 ($645,232, J.A. 425 at Column 1, Row 35) was sent directly from PCMG to third-party administrators, leaving approximately $755,000 of Check 1 monies retained and

7

unaccounted for by PCMG.[6]  Thus, a total of $952,000 of Check 1 monies ($755,000 plus $197,000) was ultimately retained by PCMG.  *Doyle*, 2014 WL 6747882, at *15.

Of the approximately $3.1 million in Check 1 monies received from PCMG, PCI/NP sent approximately $2.1 million ($2,076,329, J.A. 425, sum of Column 1, Rows 4, 9, 14, and 19) to third-party claims administrators.[7]  PCI/NP also sent approximately $430,000 ($429,310, J.A. 423 at Column 1, Row 16) of Check 1 monies to PITWU as "union dues."  The District Court concluded that PCI/NP retained several hundred thousand dollars of Check 1 monies.  *Doyle*, 2014 WL 6747882, at *15.

## B.    Procedural Background

In April 2005, the Secretary of Labor initiated this action for breach of fiduciary duties against Doyle, Holloway, the Fund, and two other individuals.[8]  The case proceeded to a bench trial in October 2009.  As to Holloway and Doyle, the District Court concluded that the Secretary had failed to show that they had breached their fiduciary duties to the Fund, and entered judgment in their favor.  *See Solis v. Doyle*, No.

---

[6] The Secretary does not allege breach of fiduciary duty with respect to the approximately $645,000 sent by PCMG directly to claims administrators.  *See Doyle*, 2014 WL 6747882, at *15.

[7] The Secretary does not allege breach of fiduciary duty with respect to this approximately $2.1 million sent by PCI/NP to claims administrators.  *See Doyle*, 2014 WL 6747882, at *15.

[8] The two other defendants were Michael Garnett and Mark Maccariella.  At the beginning of trial, Maccariella accepted a consent judgment enjoining him from serving as a fiduciary or service provider to an ERISA plan and requiring him to pay $195,317.  *See Doyle*, 2014 WL 6747882, at *2.  Garnett did not appear at trial and the District Court entered a default judgment against him.  *Id.*

05-CV-2264, 2010 WL 2671984 (D.N.J. June 30, 2010). The District Court noted that "the Secretary is offended by the percentage of employer contributions that were *not* forwarded to medical providers to pay claims" but had "introduced no evidence that the fees charged [by Doyle/PCMG] were excessive, unreasonable, or contrary to plan documents." *Id.* at *8. The District Court noted that Doyle offered undisputed testimony that PCMG's fees were customary. *Id.* The Secretary of Labor appealed.

On appeal, we vacated the District Court's judgment and remanded to the District Court for additional factual findings. *See Sec'y of Labor v. Doyle*, 675 F.3d 187 (3d Cir. 2012). Specifically, we directed the District Court to: (1) make detailed factual findings concerning the nature of the funds received and controlled by Doyle and determine whether some or all of those funds were "plan assets" under ERISA;[9] (2) determine whether Doyle was a functional fiduciary with respect to any plan assets; (3) determine whether Doyle breached his fiduciary duties; and (4) determine whether Holloway breached her fiduciary duties with respect to plan assets. *Id.* at 202–03.

In our opinion, we observed that "Doyle's unrefuted testimony that the Check 2 funds he collected for marketing fees were customary or reasonable does not mean that he did not violate any fiduciary duties under ERISA." *Id.* at 201. Finding the state cease and desist orders significant, we likened PCI/NP's promotion of the Fund to a "scheme"

---

[9] As we noted, a determination of what funds were "plan assets" was necessary because "if . . . the payments collected by PCI/NP and PCMG were not plan assets, and the only assets of the Fund were those payments received by the Fund's claims administrators, then Doyle did not handle any plan assets, and could not be a fiduciary under ERISA." 675 F.3d at 200.

9

to "masquerad[e]" an "inadequately funded health benefit plan" as an ERISA-exempt plan "in order to evade the solvency controls imposed by state insurance regulation." *Id.* at 197. We concluded that the CBAs between PITWU and PCI/NP were "bogus" insofar as they were not the result of bona fide collective bargaining to benefit employer members and the employees enrolled by PCI/NP in PITWU were not genuine union members. *Id.* at 197 n.23. We noted "it is important to keep the nature of the scheme firmly in mind" and stated that, "[a]t a minimum, expenditures for marketing this illegal scheme were not reasonable expenses for the benefit of plan participants." *Id.* at 197, 201.

After remand, the parties submitted proposed findings of fact and conclusions of law to the District Court. The District Court heard no further testimony and held no further proceedings.

In its decision following remand, the District Court found that both the Check 1 and Check 2 monies were plan assets of the Fund because of representations made to employers by PCMG and PCI/NP that the total amount of employers' contributions—i.e., Check 1 and Check 2 monies combined—was the cost of procuring health insurance when the employers adopting the Fund as a health plan. *See Sec'y of Labor v. Doyle*, No. 05-CV-2264, 2014 WL 6747882, at *11 (D.N.J. Dec. 1, 2014). The District Court declined to consider the CBAs between PCI/NP and the Fund—which set the contribution rates—because the client-employers of PCI/NP did not receive the CBAs

10

and because their employees did not become genuine union members. *Id.* at *9.[10]

The District Court found that Doyle was a functional fiduciary of the Fund's plan assets because he had discretion over how much money PCMG would retain from the employer contributions. *Id.* at *14. The Court concluded that Doyle had breached his duty of loyalty with respect to: (1) the approximately $952,000 which PCMG retained from Check 1; (2) the $374,000 which PCI/NP retained from Check 1; and (3) the $429,310 in "union dues" forwarded by PCI/NP to PITWU. *Id.* at *15. In addition, the Court found that Doyle had breached his duties of loyalty and prudence by permitting the diversion of plan assets to PCMG and PCI/NP as payments for sales commissions, service fees, administrative charges, and union dues. *Id.* at *16.

The District Court further determined that Holloway had breached her duty of prudence to the Fund. *Id.* at *17–18. The Court explained that Holloway knew or should have known that the CBAs were not the result of bona fide collective bargaining. *See id.* The Court concluded that Holloway had breached her duty of prudence by ignoring evidence that the Fund was being mismanaged and was underfunded, and by failing to do enough in the face of this evidence. *See id.* The Court also relied on the fact that Holloway did not ask for financial records of PCI/NP and PCMG, did not compel an accounting or invoke the mandatory arbitration clause in the Trust Agreement, and did not sue her co-trustees. *Id.* at *17.

The Court held Doyle and Holloway jointly and severally liable as co-fiduciaries

---

[10] *See supra* n.2.

11

and entered judgment against Doyle in the amount of $3,882,867.98[11] plus prejudgment interest, and against Holloway in the amount of $4,698,871.98,[12] plus prejudgment interest. *Id.* at *20. This timely appeal followed.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291.

On appeal from a bench trial, we review a district court's findings of fact for clear error and its conclusions of law de novo. *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 283 (3d Cir. 2014). "A finding of fact is clearly erroneous when it is 'completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data.'" *Id.* (quoting *Berg Chilling Sys., Inc. v. Hull Corp.*, 369 F.3d 745, 754 (3d Cir. 2004)).

---

[11] This amount "represents the difference between the money that employers paid in for benefits and the money that was paid out to claims administrators to administer and pay benefits—plan assets diverted from the Fund." 2014 WL 6747882, at *20.

[12] The difference between this amount and Doyle's liability (i.e., $816,004) "is the amount of money received by PCI/NP from employers who were not recruited through PCMG; accordingly, none of this money passed through PCMG." 2014 WL 6747882, at *20.

## III.    ANALYSIS[13]

### A.    Plan Assets

Appellants first argue that the District Court erred in concluding that all

contributions from PCI/NP's employer-clients—i.e., both Check 1 and Check 2 monies—

were "plan assets" under ERISA.  Specifically, Appellants contend that the District Court

improperly analyzed the Fund's interest in employer contributions from the employers'

point of view and improperly disregarded the CBAs between PITWU and PCI/NP.

Under Appellants' approach, the CBAs are the only representations relevant to the "plan

assets" inquiry, and these limited the Fund's interest to only those contributions sent from

PCI/NP and to only those amounts specified by the rates contained in the CBAs.

Appellants' arguments are unavailing.

In *Doyle I*, we explained that:  "assets of a plan generally are to be identified on

the basis of ordinary notions of property rights under non-ERISA law" and may include

"any property . . . in which the plan has a beneficial ownership interest."  *See* 675 F.3d at

203 (quoting Department of Labor, Advisory Op. No. 93-14A, 1993 WL 188473, at *4

(May 5, 1993)).  In an Advisory Opinion cited by Appellants in their papers, the

Department of Labor advised that whether a plan has acquired a beneficial interest in

particular funds depends on "whether the plan sponsor expresses an intent to grant such a

---

[13] We note that, generally, ERISA is a remedial statute and "should be liberally construed in favor of protecting the participants in employee benefit plans."  *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 98 (3d Cir. 2011) (quoting *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986)).

beneficial interest or has acted *or made representations sufficient to lead participants and beneficiaries of the plan to reasonably believe that such funds separately secure the promised benefits or are otherwise plan assets*." Department of Labor, Advisory Op. No. 94-31A, 1994 WL 501646, at *3 (Sept. 9, 1994) (emphasis added). Contrary to Appellants' assertion, under this latter phrase, a court may consider the reasonable beliefs of plan participants—here, PCI/NP's client-employers—based on representations attributable to PITWU. Therefore, the District Court did not err in examining participating employers' reasonable beliefs, based on Doyle's representations, that their total contributions to PCMG were required to participate in the Fund.

The record supports the District Court's conclusion that employers reasonably believed the combined Check 1 and Check 2 amount was the cost of insurance for each employee. By Doyle's design, employers originally sent in one single check to enroll in the Fund and get health benefits for their employees, and only after did he divide payments into two checks, ostensibly one for health insurance contributions (Check 1) and one for PEO services (Check 2). Several employers testified that they believed that their payments to PCMG were only for health insurance. Based on the above, we agree with the District Court that the Fund had a beneficial interest in all employer contributions, regardless of whether the contributions were made via the initial single check, Check 1, or Check 2.

Doyle asserts that he had no contract or agreement with the Fund and that without such a relationship, the Fund had no interest in the Check 2 monies. Even accepting Doyle's assertion that he had no direct authorization to be the Fund's agent, Doyle acted

14

with apparent authority of the Fund.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 345 (3d Cir. 2004) (apparent authority is "that authority which, although not actually granted, the principal knowingly permits the agent to exercise"); *Taylor v. Peoples Nat. Gas Co.*, 49 F.3d 982, 989–90 (3d Cir. 1995) (applying doctrine of apparent authority to determine whether individual was an agent of ERISA plan).  Doyle and PCMG promoted the Fund, acted as a conduit for the Fund by representing that PCMG would remit the enrollment forms or change of coverage forms to the Fund, and PCMG was the single contact for employers' contributions to the Fund.  Moreover, employers never received the CBAs which specified the contribution rates; employers relied upon PCMG's representations regarding the applicable contribution rate.

These representations referenced PITWU and were permitted by the Fund.  In the client enrollment forms which Doyle provided to employers to gain access to the Fund, employers checked the "health benefit" box and the "union" box.  J.A. 155.  Employers were required to execute a "Disclosure Form" which stated that "[t]his health and welfare plan is sponsored by [PITWU]."  J.A. 158.  And the Fund's third-party administrators received and reviewed these enrollment forms and did nothing to stop Doyle and PCMG's representations, thereby permitting the representations.

Appellants also argue that only payments from PCI/NP to the Fund constitute plan assets because only PCI/NP signed on to the Declaration of Trust.  The Declaration of Trust creating the Fund identified the Fund's assets as "any and all contributions payable by EMPLOYERS" and required that these contributions "shall be paid" "into" the Fund.  J.A. 92.  However, we need not determine whether PCI/NP's client-employers became

15

"EMPLOYERS" under the Declaration of Trust because, as explained above, monies may become plan assets not only based on the terms of the plan's governing documents, but by the plan sponsor's representations to participants. And we have determined that the representations made by PCI/NP and PCMG were sufficient to lead participants to reasonably believe that their contributions were made to secure benefits.

Finally, Appellants argue that the CBAs between PCI/NP and the Fund should limit the amount of client-employer contributions in which the Fund had a beneficial interest because the CBAs set forth contributory rates that were less than total client-employer contributions to PCMG. As we noted in *Doyle I*, the CBAs were "bogus" insofar as they were not the result of bona fide collective bargaining between PCI/NP and PITWU and PCI/NP's client-employers were not genuine PITWU members. 675 F.3d at 197 n.23. Allowing the CBAs to shield liability for diversion of plan assets would be counter to ERISA's remedial purpose. Given our previous guidance that "it is important to keep the nature of the scheme firmly in mind," *id.* at 197, we agree with the District Court that the CBAs' contribution rates should not limit its "plan assets" analysis.

In sum, we find no error in the District Court's conclusion that all contributions from employers—i.e., both Check 1 and Check 2 monies—were "plan assets" within the meaning of ERISA.

## B. Doyle's Status as Functional Fiduciary and Breach of His Duties

Doyle next argues that the District Court erred in holding that he was a functional fiduciary of the Fund and that he breached his duties of loyalty and prudence to the Fund. Doyle primarily argues that he had no authority or control over the Check 1 and Check 2

monies so as to be a functional fiduciary under ERISA, and that the Secretary failed to prove Doyle's knowledge that the Check 1 employer contributions forwarded to PCI/NP were not being used for any legitimate purpose related to the Fund.[14]

Under ERISA, a person is a fiduciary if, inter alia, "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i).[15] Having concluded that all employer contributions were "plan assets," we have no trouble agreeing with the District Court that Doyle exercised authority and control over the disposition of those assets.

Doyle not only set up the two-check system, invoiced employers, collected Checks 1 and 2, and was responsible for remitting Check 1 to PCI/NP, he determined how much to charge employers for sales commissions—without consulting PCI/NP or Fund

---

[14] To the extent that Doyle argues that the marketing fees paid to PCMG via Check 2 were reasonable and cannot support a finding that he breached his fiduciary duties, (Br. of Appellant Doyle at 24–25), we decline to overrule our prior determination in *Doyle I* that "expenditures for marketing th[e] illegal scheme were not reasonable expenses for the benefit of plan participants." *See* 675 F.3d at 201.

[15] Although Doyle argues that he had no "discretionary authority or control" over the Fund's assets, (Br. of Appellant Doyle at 13), we need not rely on a finding of discretion to conclude that Doyle was a functional fiduciary. We recognize a "significant difference between the two clauses [of subsection (i) in] that discretion is specified as a prerequisite to fiduciary status for a person managing an ERISA plan, but the word 'discretionary' is conspicuously absent when the text refers to assets." *Srein v. Frankford Trust Co.*, 323 F.3d 214, 221 (3d Cir. 2003). "The statute treats control over the cash differently from control over administration," and imposes "a lower threshold for fiduciary status where control of assets is at stake." *See Bd. of Trustees of Bricklayers v. Wettlin Assocs., Inc.*, 237 F.3d 270, 274 (3d Cir. 2001) (internal quotation and citation omitted).

trustees—and therefore it was he who determined how much PCMG would retain of employer contributions. *See Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 722 F.3d 861, 866–67 (6th Cir. 2013) (rejecting defendant's claim that it "merely acted as a 'pass-through' and not as a fiduciary" and concluding that insurer that was an ERISA fiduciary with respect to hidden fees that it unilaterally added to hospital claims subsequently paid by the fund); *Metzler v. Solidarity of Labor Orgs. Health & Welfare Fund*, No. 95-CV-7247, 1998 WL 477964, at *7 (S.D.N.Y. Aug. 14, 1998), *aff'd sub nom. Herman v. Goldstein*, 224 F.3d 128 (2d Cir. 2000) ("[B]ecause defendants had set the total sum of the contribution employers had to pay (over and above the coverage rates set by the Fund and the union membership fee set by [the union]) to receive benefits through the Fund, the Court [] concludes that defendants are fiduciaries within the meaning of ERISA.").

As a functional fiduciary, Doyle had a duty of loyalty to act "for the exclusive purpose of (i) providing benefits to [Fund] participants and beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Doyle argues that the District Court erred in concluding that Doyle breached his duty of loyalty with respect to: (1) the approximately $952,000 that PCMG retained from Check 1; (2) the $374,000 that PCI/NP retained from Check 1; and (3) the $429,310 in "union dues" forwarded by PCI/NP to PITWU.

As to the $952,000 that PCMG retained from Check 1, the District Court concluded that this sum consisted of $755,000 of unaccounted for Check 1 monies and approximately $197,000 in "refunds" from PCI/NP to PCMG. Doyle contends that the

these monies "could have [] included payments" for payroll services, gap insurance, and administrative fees that were combined with Check 1 health claims contributions when client-employers paid a single check to PCMG. (Br. of Appellant Doyle at 21.) However, Doyle's argument on appeal as to what services the $755,000 or $197,000 "could have" paid for does not convince us that the District Court clearly erred in concluding that the monies did *not* go to benefit contributing employers.

As to the other two sums, the District Court relied on Doyle's own testimony that he was aware that PCI/NP retained a portion of the Check 1 monies and remitted a portion for "union dues." *See* 2014 WL 6747882 at \*16 (citing Trial. Tr. 64:10–15, 71:24–72:5, 85:6–22, 88:3–17, 138:2–12). Given these admissions, we conclude that the District Court did not clearly err in concluding that Doyle breached his duty of loyalty to the Fund because he knew that these monies were not used to benefit plan participants.[16]

### C. Holloway's Fiduciary Duties

Holloway challenges the District Court's finding that she breached her duty of prudence to the Fund on the ground that the Secretary did not establish that Holloway failed to monitor the Fund or deviated from the ERISA standard of care. We conclude

---

[16] Because we agree with the District Court's finding that Doyle knew or should have known about PCI/NP's scheme to retain plan assets—and therefore breached his duties of loyalty and prudence—we need not separately address Doyle's argument that the District Court erred in concluding that Doyle is liable for PCI/NP's breaches as a co-fiduciary. *See* 29 U.S.C. § 1105(a)(2) (providing for liability for the breach of a co-fiduciary where fiduciary, "by his failure to comply with [the duty of loyalty or prudence] in the administration of his specific responsibilities which give rise to his status as a fiduciary, [that] fiduciary has enabled such other fiduciary to commit a breach").

that, although the District Court may have properly found that Holloway breached her duty of prudence through inaction during her tenure as trustee, the evidence adduced at trial is insufficient to support a conclusion that Holloway failed to act as a prudent trustee prior to May 30, 2002. Therefore, we will not affirm the District Court's conclusion that Holloway was liable for *all* diverted plan assets, regardless of when the diversion occurred. Rather, we will remand to the District Court to make detailed factual findings about the extent of Holloway's liability after May 30, 2002, considering when Holloway became aware of red flags related to diverted participant contributions.

The District Court first concluded that, generally, "Holloway knew or should have known the facts upon which the Circuit based its conclusion that the CBAs 'were not the result of bona fide collective bargaining.'" 2014 WL 6747882 at *17 (quoting *Doyle I*, 675 F.3d at 197). The District Court also relied on the fact that "at least one of the cease and desist orders contained an express finding that the PITWU Union [sic] was not a bona fide labor union." *Id.* However, when we concluded in *Doyle I* that the CBAs were not the result of bona fide collective bargaining, we also rejected the Secretary's claim that PITWU was a "bogus" union and noted that "no similar evidence [regarding the lack of bona fide collective bargaining] was presented concerning the CBAs between PITWU and its other employer members, ECI and EDI"—the latter of which Holloway owned. 675 F.3d at 197 n.23. Moreover, the cease and desist order cited by the District Court was issued in June 2002, and therefore cannot support a finding of breach of fiduciary duty by Holloway prior to that date.

The District Court also concluded that

> [f]rom nearly the inception of her trusteeship, Holloway was aware that: there were "boxes" of claims that had not been processed; that there were large numbers of unpaid health claims; financial reports could not be prepared because of the lack of financial data; [and] the [third-party administrator] reported insufficient funding to pay adjudicated and valid claims.

2014 WL6747882 at *17. However, the District Court's factual findings indicate that Holloway first learned about the "boxes" of pending claims and the administrator's concern that claims had not been paid for months at the trustee meeting on April 23, 2002. At that time, the magnitude of unpaid claims, and whether there was sufficient funding to meet this requirement, was unknown due to lack of data. *See id.* Because the District Court's factual findings do not indicate that evidence of the Fund's mismanagement was available to Holloway before April 23, 2002, we cannot agree that Holloway should have known "[f]rom nearly the inception of her trusteeship" in May 2001 that the Fund was being mismanaged or was underfunded.

Moreover, we disagree with the District Court's conclusion that Holloway did not react as a prudent trustee should to the concerns raised at the April 23, 2002 meeting. When Holloway first learned of the "boxes" of unprocessed claims, she ordered the Fund's new third-party administrator to enter all claims into the Fund's database to determine the size and nature of the problem and set a deadline for a report-back. Thus, although the reports of unprocessed claims raised concerns, Holloway reasonably reacted to and addressed the potential problem.

However, more serious red flags were raised at the May 30, 2002 trustee meeting. Then, both the Fund's accountant and actuary reported that they still lacked the financial

21

information "required by them to perform their essential functions" such as reporting on the financial condition of the Fund. J.A. 171. Further, the record reveals a discrepancy regarding Weinstein's responsiveness to the trustees' prior request for information: while Weinstein claimed to have already provided all information to the new third-party administrator, the administrator reported that it had not received all the previous information and documentation about the Fund. *See* J.A. 171–72. Although Holloway and the trustees developed a plan for the information and documentation to be conveyed to the relevant parties, Holloway's lack of meaningful follow-up after this meeting supports a finding of a breach of her fiduciary duties after May 30, 2002.

At oral argument, the Secretary contended that Holloway should be liable for all diverted assets because she failed, from the creation of the Fund in January 2001, to create a mechanism for collecting employer contributions and processing benefit claims that would have prevented PCMG and PCI/NP's scheme. We disagree.[17] As we have explained, Holloway's action or inaction as a trustee must be assessed against when information or red flags became available to her. Accordingly, we will vacate the District Court's judgment regarding Holloway's liability and remand to the District Court to make detailed factual findings as to when, after May 30, 2002, Holloway knew or should

---

[17] The Secretary's stance would impose the impossible standard of omniscience on Holloway. There is nothing inherently nefarious about a PEO such as PCI/NP becoming a member of the Fund, should it properly remit its client-employer contributions to the Fund and provide other legitimate PEO services. Indeed, Holloway's PEO, EDI, was a member of the Fund. There is nothing in the record indicating that, *ab initio*, Holloway should have suspected that Weinstein, through PCI/NP, would divert plan assets.

have known that the Fund was being mismanaged or was underfunded.[18]

## IV. CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court regarding Doyle and vacate and remand the District Court's judgment regarding Holloway.

---

[18] On remand, the District Court should, based on its findings regarding Holloway, similarly clarify the extent of Holloway's liability for the breaches of other fiduciaries.