20-1185-cv
*NY State Teamsters v. C&S Wholesale Grocers*

# In the
# United States Court of Appeals
## for the Second Circuit

---

AUGUST TERM 2020

No. 20-1185-cv

NEW YORK STATE TEAMSTERS CONFERENCE PENSION AND
RETIREMENT FUND, by its Trustees, Michael S. Scalzo, Sr., John
Bulgaro, Daniel W. Schmidt, Tom J. Ventura, Bob Schaeffer, Brian
Hammond, Mark May and Paul Markwitz,

*Plaintiff-Appellant*,

v.

C&S WHOLESALE GROCERS, INC.,

*Defendant-Appellee.**

---

On Appeal from the United States District Court
for the Northern District of New York

---

ARGUED: MAY 3, 2021
DECIDED: JANUARY 27, 2022

---

* The Clerk of Court is directed to amend the caption as set forth above.

Before: CABRANES, RAGGI, and CARNEY, *Circuit Judges*.

———————

This case presents four questions: (1) whether the United States District Court for the Northern District of New York (Frederick J. Scullin, Jr., *Judge*) erred in dismissing the claim of Plaintiff New York State Teamsters Conference Pension and Retirement Fund (the "Fund") that Defendant C&S Wholesale Grocers ("C&S") "evaded and avoided" withdrawal liability under the Employee Retirement Income Security Act ("ERISA"); (2) whether the District Court erred in dismissing the Fund's claim that C&S was subject to withdrawal liability under a theory of "common control"; (3) whether the District Court erred in not finding that C&S was subject to withdrawal liability as an "employer"; and (4) whether the District Court erred in granting C&S's motion for summary judgment on the Fund's claim that C&S was subject to withdrawal liability as a "successor" under the "substantial-continuity doctrine." We hold that the District Court did not err in dismissing the claims based on the first two liability theories or in failing to find that C&S was an "employer." We also hold that while a "successor" can be subject to withdrawal liability under ERISA, the District Court, in the circumstances presented here, did not err in granting the Defendant's motion for summary judgment as to that claim. Accordingly, we **AFFIRM** the District Court's order and judgment.

———————

EDWARD J. MEEHAN (Mark C. Neilsen, Samuel I. Levin, *on the brief*), Groom Law Group, Chartered, Washington, D.C. (Vincent M. DeBella, Paravati, Karl, Green & DeBella, LLP, Utica, NY, *on the brief*), *for Plaintiff-Appellant*.

YAAKOV M. ROTH (Evan Miller, Stephen J. Petrany, *on the brief*), Jones Day, Washington, D.C., *for Defendant-Appellee.*

———————

JOSÉ A. CABRANES, *Circuit Judge*:

This case presents four questions: (1) whether the United States District Court for the Northern District of New York (Frederick J. Scullin, Jr., *Judge*) erred in dismissing the claim of Plaintiff New York State Teamsters Conference Pension and Retirement Fund (the "Fund") that Defendant C&S Wholesale Grocers ("C&S") "evaded and avoided" withdrawal liability under the Employee Retirement Income Security Act ("ERISA"); (2) whether the District Court erred in dismissing the Fund's claim that C&S was subject to withdrawal liability under a theory of "common control"; (3) whether the District Court erred in not finding that C&S was subject to withdrawal liability as an "employer"; and (4) whether the District Court erred in granting C&S's motion for summary judgment on the Fund's claim that C&S was subject to withdrawal liability as a "successor" under the "substantial-continuity doctrine." We hold that the District Court did

3

not err in dismissing the claims based on the first two liability theories or in failing to find that C&S was an "employer." We also hold that while a "successor" can be subject to withdrawal liability under ERISA, the District Court, in the circumstances presented here, did not err in granting the Defendant's motion for summary judgment as to that claim. Accordingly, we **AFFIRM** the District Court's order and judgment.

## I. BACKGROUND

Penn Traffic Company ("Penn Traffic") was a company based in Syracuse, New York, that operated approximately 80 retail grocery stores. Penn Traffic also operated two warehouses—one in Syracuse and one in DuBois, Pennsylvania—where it stored wholesale groceries, which it then distributed both to its own retail stores and to other "independent" retail stores.

At its Syracuse warehouse, Penn Traffic employed approximately 450 members of the Teamsters Local 317 union ("Union") under a collective bargaining agreement ("CBA") that required Penn Traffic to contribute to the Fund. The Fund, the Plaintiff-Appellant in this action, is organized as a "multiemployer plan" regulated by ERISA, under which Penn Traffic was subject to significant "withdrawal liability" if it ceased to make contributions. Briefly, if Penn Traffic "withdrew" from the Fund by ceasing to make

4

contributions to it, Penn Traffic was liable to the Fund for its share of the Fund's unfunded vested benefits.[1]

Defendant C&S is a grocery wholesaler that also operates warehouses and distributes groceries to retailers. In March 2008, C&S began investigating a possible acquisition of Penn Traffic. C&S did not want to acquire Penn Traffic's Syracuse warehouse because of the pension withdrawal liability associated with it. C&S therefore attempted to structure its $43 million acquisition transaction, executed in December 2008, in such a way as to limit its exposure to that liability: C&S acquired "Penn Traffic's wholesale distribution contracts, customers, equipment, files, records, goodwill, intellectual property, accounts receivable, and employees dedicated to Penn Traffic's wholesale distribution division who were <u>not</u> members of Teamsters Local 317."[2] And C&S did not purchase the Syracuse warehouse.

Following the transaction, Penn Traffic continued to run its Syracuse warehouse and distributed products to both its own stores and the independent stores that were now C&S customers based on the December 2008 transaction. This activity was governed by a third-party logistics agreement ("Logistics Agreement") that created an independent contractor relationship between Penn Traffic and C&S. Penn Traffic retained responsibility for "all employees, [f]acility and storage leases, material handling and transportation equipment, contracts and all other liabilities associated with" the Syracuse

---

[1] *See* Section II.A, *infra.*

[2] App'x 44 ¶ 52 (emphasis in the original).

warehouse.[3] The Logistics Agreement made clear that Penn Traffic was still responsible for employees at the Syracuse warehouse (the "Teamsters"), and that C&S was not:

> Penn Traffic Employees shall not be considered or deemed in any way to be employees of C&S. C&S shall not exercise any authority over the Penn Traffic Employees, including, but not limited to, selecting, engaging, fixing the compensation of, discharging and otherwise managing, supervising and controlling the Penn Traffic Employees and no joint employer relationship shall exist.[4]

In November 2009, Penn Traffic filed for protection under Chapter 11 of the Bankruptcy Code. C&S then purchased the DuBois warehouse. A Penn Traffic competitor and longtime C&S client purchased many of Penn Traffic's retail stores. The Syracuse warehouse closed in May 2010, triggering the claimed withdrawal liability for which the Fund filed a $63.6 million claim in Penn Traffic's bankruptcy proceeding. The bankruptcy estate was able to cover only $5 million of that amount. The Fund then sought the remainder of the withdrawal liability—about $58 million—from C&S in this action, alleging various theories under which Penn Traffic's withdrawal liability was either transferred to, or jointly shared with, C&S.

---

[3] Suppl. App'x 126.

[4] Suppl. App'x 144.

6

The Fund's initial complaint was filed on January 22, 2016. On March 21, 2016, C&S moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted. On April 8, 2016, the Fund filed an amended complaint alleging theories of C&S's liability in four counts: (1) C&S was subject to the withdrawal liability as the "successor" to Penn Traffic ("successor liability"); (2) C&S had intentionally avoided the withdrawal liability, triggering a statutory provision, 29 U.S.C. §1392(c), designed to re-impose the liability in such a case ("evade-or-avoid liability"); (3) C&S was subject to the withdrawal liability because it had "common control" over the Syracuse warehouse Teamsters ("common control liability"); and (4) C&S was subject to the withdrawal liability as a "joint employer" of the Syracuse warehouse Teamsters ("joint employer liability").

On April 22, 2016, C&S filed a supplemental motion to dismiss, addressing the Fund's amended complaint. On May 1, 2017, the District Court granted C&S's supplemental motion in part and denied it in part. The District Court dismissed the theories of evade-or-avoid, common control, and joint employer liability, leaving as viable only the Fund's theory of successor liability. The District Court held that withdrawal liability could obtain under a successor liability theory and that the Fund's pleadings on this count were sufficiently plausible to withstand a motion to dismiss.

C&S moved for a certificate of appealability, under 28 U.S.C. § 1292(b), seeking to argue before us that, as a matter of law, there was no successor withdrawal liability under ERISA. On February 6, 2018,

the District Court denied that motion. The parties proceeded to discovery, at the conclusion of which they filed cross-motions for summary judgment.

On March 18, 2020, the District Court granted C&S's motion for summary judgment, holding that C&S "did not substantially continue Penn Traffic's business after the 2008 transaction" and therefore could not "be held responsible for Penn Traffic's withdrawal liability under the doctrine of successor liability."[5]

On appeal, the Fund challenges: (1) the District Court's dismissal of the "evade-or-avoid liability" theory; (2) its dismissal of the "common control liability" theory; (3) its finding that C&S was not an "employer" for the purpose of determining withdrawal liability;[6] and (4) its grant of summary judgment to C&S on the "successor liability" theory. We review each of these challenges in turn.

## II. DISCUSSION

We review *de novo* a dismissal of a complaint for failure to state a claim upon which relief can be granted.[7] Likewise, "[w]e review *de novo* a district court's grant of summary judgment after construing all

---

[5] Special App'x 53–54 (emphasis omitted).

[6] The Fund abandons its theory of "joint employer liability" on appeal and asserts, instead, a challenge to the District Court's failure to find that C&S's logistics agreement was a "subterfuge," rendering C&S an "employer" of the Syracuse warehouse Teamsters. *See Section* II.D *infra*.

[7] *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 467 (2d Cir. 2019).

evidence, and drawing all reasonable inferences, in favor of the non-moving party."[8]

## A. Withdrawal Liability

Congress enacted ERISA in 1974 in part "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans."[9] Plans to which multiple employers contributed jointly presented special concerns in this regard, because if one employer pulled out, this "reduce[d] a plan's contribution base" and "pushe[d] the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities."[10] Within the first few years after ERISA's enactment, a "significant number" of multiemployer plans were experiencing "extreme financial hardship."[11]

To address this concern, in 1980, Congress passed the Multiemployer Pension Plan Amendments Act ("MPPAA"), which amended ERISA to provide that "[i]f an employer withdraws from a multiemployer plan . . . then the employer is liable to the plan in the

---

[8] *Sotomayor v. City of New York*, 713 F.3d 163, 164 (2d Cir. 2013).

[9] *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984).

[10] *Id.* at 722 n.2 (quoting *Pension Plan Termination Insurance Issues: Hearings before the Subcomm. on Oversight of the H. Comm. on Ways and Means*, 95th Cong. 22 (1978) (statement of Matthew M. Lind, Executive Director of the Pension Benefit Guarantee Corporation)).

[11] *Id.* at 721.

amount determined . . . to be the withdrawal liability."[12] This statutory scheme was designed to "reduc[e] the burden of withdrawal on the plan and remaining employers,"[13] and thereby "protect the financial solvency of multiemployer pension plans."[14]

Withdrawal liability is calculated based on the MPPAA, and generally represents the portion of a multiemployer pension fund's "unfunded vested benefits" allocable to the withdrawing employer.[15] A "complete withdrawal," which can trigger liability under the statute, occurs when an employer "permanently ceases to have an obligation to contribute under the plan" or "permanently ceases all covered operations under the plan," for example by going out of business, or renegotiating the terms of its CBA.[16] When this occurs, "the entity maintaining the plan[] must determine the amount of the employer's withdrawal liability, notify the employer of the amount[,] and make a demand for payment."[17]

---

[12] 29 U.S.C. § 1381(a); *see generally R.A. Gray*, 467 U.S. at 720–25 (explaining the history of the passage of the MPPAA).

[13] *R.A. Gray*, 467 U.S. at 722 (internal quotation marks omitted).

[14] *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 196 (1997).

[15] 29 U.S.C. § 1381(b)(1); *see generally ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 881 (2d Cir. 1988) (outlining the statutory scheme for the imposition of withdrawal liability).

[16] 29 U.S.C. § 1383(a); *see HOP Energy, LLC v. Loc. 553 Pension Fund*, 678 F.3d 158, 161 (2d Cir. 2012) (noting that a company may be subject to withdrawal liability if "it permanently went out of business").

[17] *Levy Bros. Frocks*, 846 F.2d at 881; 29 U.S.C. § 1382.

## B.  Evade-or-Avoid Liability

The Fund argues that C&S acted intentionally to "evade or avoid" withdrawal liability by structuring its 2008 acquisition of Penn Traffic's distribution business in such a way as to never assume control of the Syracuse warehouse or its employees. According to the Fund, C&S can therefore be held liable under 29 U.S.C. § 1392(c), a provision of the MPPAA which establishes "evade-or-avoid" liability.

Section 1392 provides that "[i]f a principal purpose of any transaction is to evade or avoid [withdrawal] liability," then withdrawal liability "shall be applied (and liability shall be determined and collected) without regard to such transaction."[18] In other words, employers who are subject to withdrawal liability generally cannot engage in a transaction—the sale of their assets, for example—for the purpose of evading or avoiding that liability. If they do, they are subject to the liability as though the transaction in question did not occur.[19] Congress's intent in imposing evade-or-avoid liability was to "prevent withdrawing employers from threatening the

---

[18] 29 U.S.C. § 1392(c).

[19] *See, e.g., IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1053, 1056, 1057–58 (2d Cir. 1993) (noting that withdrawal liability claim was sufficiently stated where the alleged "principal purpose" of a company's sale of assets and bonuses issued to the company's owner "was to evade or avoid withdrawal liability").

financial stability of a plan by requiring the employers to pay their share of unfunded vested benefit liability."[20]

C&S argues that it was never subject to withdrawal liability to begin with, because it never owned the Syracuse warehouse or entered into an employment relationship with the Teamsters who worked there. Therefore, the first question we must answer is: Does "evade-or-avoid" liability apply only to "employers" seeking to avoid their withdrawal liability, or can non-employers also be held liable under the statute?

In evaluating the issue, we consider our decision in *IUE AFL-CIO Pension Fund v. Herrmann*.[21] There, an employer ("Manufacturing") entered into an agreement with a buyer ("Mowers"), in which Mowers acquired Manufacturing's assets but did not assume any of Manufacturing's liability under a multiemployer pension plan. Manufacturing's owner, Herrmann, was alleged to have siphoned significant funds away from his company in the course of the acquisition, in the form of signing bonuses and side-deals. The pension fund alleged that "[t]hese transactions . . . rendered Manufacturing insolvent."[22] When Manufacturing went bankrupt and withdrew from its multiemployer pension plan, the fund sued not just Manufacturing (the relevant employer), but also Herrmann and

---

[20] *SUPERVALU, Inc. v. Bd. of Trs. of Sw. Pa. & W. Md. Area Teamsters & Emps. Pension Fund*, 500 F.3d 334, 342 (3d Cir. 2007).

[21] 9 F.3d 1049.

[22] *Id.* at 1053.

Mowers to recover under Section 1392. We held that "[t]o calculate and collect liability, 'without regard to [the] transaction,' any assets that were transferred in order to 'evade or avoid liability,' as well as the parties to whom they were improperly transferred,"—*i.e.*, non-employers Herrmann and Mowers—"must be within the reach of the statute."[23]

According to the Fund, in the instant case, because C&S clearly structured its acquisition of Penn Traffic's assets in a way that limited its exposure to the withdrawal liability associated with the Syracuse warehouse and the Teamsters, the logic of *Herrmann* exposes C&S to liability under Section 1392.

In our view, *Herrmann* does not require that C&S similarly "must be within the reach of the statute." First, the plaintiffs in *Herrmann* sufficiently pleaded that the asset transfer at issue was fraudulent.[24] There are no allegations of fraud in this case, and any such claims would, at this stage, be waived.[25] Herrmann allegedly controlled Manufacturing and *worked together* with Mowers to illicitly direct Manufacturing's funds so that it could avoid Manufacturing's withdrawal liability. The analogous scenario in this case would be one in which Penn Traffic worked with C&S to bankrupt *itself* in order to

---

[23] *Id.* at 1056 (emphasis omitted) (quoting 29 U.S.C. § 1392(c)).

[24] *Id*. at 1058 (finding that the "fraud claims alleged in the [c]omplaint are legally sufficient").

[25] *See Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.*, 54 F.3d 69, 73 (2d Cir. 1995) ("Generally, a federal appellate court does not consider an issue not passed upon below." (internal quotation marks omitted)).

avoid *its own* withdrawal liability. As the District Court correctly pointed out, while C&S and Penn Traffic may have structured their deal so that C&S avoided assuming Penn Traffic's withdrawal liability, "they did not structure the transaction so that Penn Traffic became . . . unable to pay [Penn Traffic's] withdrawal liability."[26] In *that* hypothetical scenario, it might have made sense to bring Section 1392 claims against Penn Traffic, and C&S as well. But no such claims are alleged here.

In *Herrmann*, the reason Section 1392 could be applied to non-employers Herrmann and Mowers was that the assets at issue were alleged to have been "improperly *transferred*" to them.[27] Apportioning liability and engaging in recovery "without regard to [the] transaction"—as contemplated by the MPPAA—effectively required the plaintiffs to be able to negate the transaction and recover from the non-employer parties then possessing those funds.[28]

---

[26] Special App'x 21.

[27] *Herrmann*, 9 F.3d at 1056 (emphasis added).

[28] *Id.* ("To calculate *and* collect liability, . . . any assets that were transferred . . . as well as the parties to whom they were improperly transferred, must be within the reach of the statute."); *see also Connors v. Marontha Coal Co.*, 670 F. Supp. 45, 47 (D.D.C. 1987) ("Whenever a transaction *has removed assets from the formal structure of the corporation* being assessed for withdrawal liability, liability can only be 'collected' if there is a right of action against the transferee, whether or not it fits the definition of 'employer.' If, for example, a defendant company divided itself into two corporations for the purpose of evading the collection of withdrawal liability, liability would undoubtedly be collectible from both new corporations." (emphasis added)).

Here, by contrast, the Fund essentially alleges the opposite: that C&S improperly *failed to acquire* the assets at issue from Penn Traffic. This difference is critical. We agree with what the First Circuit has held in a similar context: that Section 1392 "requires courts to put the parties in the same situation as if the offending transaction never occurred; that is, to erase that transaction. It does not, by contrast, instruct or permit a court to take the affirmative step of writing in new terms to a transaction or to create a transaction that never existed."[29]

This is not to say that non-employers *cannot* be liable for withdrawal liability under an "evade or avoid" theory simply because they were not the original employer subject to that liability. *Herrmann* and the law of our Circuit are clearly to the contrary.[30] But it is the exceptional circumstance—involving fraud, or an employer who is otherwise working *with* a non-employer to make recovery on withdrawal liability unavailable[31]—that brings the collaborating

---

[29] *Sun Cap. Partners III, LP v. New Eng. Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129, 149 (1st Cir. 2013); *see also Lopresti v. Pace Press, Inc.*, 868 F. Supp. 2d 188, 206 (S.D.N.Y. 2012) ("[T]here is a difference between declining to assume withdrawal liability that one never had the obligation to pay and evading withdrawal liability that one is already legally obligated to pay.").

[30] *See N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 647 n.6 (2d Cir. 2005) ("[A] non-employer . . . can be sued for engaging in evade-or-avoid transactions. . . . The district court was therefore mistaken when it stated that an evade-or-avoid lawsuit is more properly brought against an admitted employer." (cleaned up)).

[31] *See id.* (noting that evade-or-avoid liability may obtain against a non-employer who works "in conjunction with" an employer).

employers and non-employers together "within the reach" of Section 1392.

A non-employer *cannot* be said to evade or avoid liability merely by declining to assume that liability in the first place. To hold otherwise would be to paradoxically and imprudently encumber with liability the perfectly sensible business decision precisely *not to purchase* an encumbered asset. The District Court therefore properly dismissed the Fund's claim for "evade or avoid" liability.

## C.    Common Control Liability

The Fund argues separately that Penn Traffic and C&S were under "common control," and that C&S is therefore liable for withdrawal liability.

Under 29 U.S.C. § 1301(b)(1), "all employees of trades or businesses . . . which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer" for the purposes of determining withdrawal liability under ERISA. ERISA adopts a definition of "common control" from tax regulations promulgated by the Secretary of the Treasury.[32]

---

[32] *See* 29 U.S.C. § 1301(a)(14)(B). Such parallel definitions are common, given that Title III of ERISA explicitly requires the Secretary of Labor and the Secretary of the Treasury to work together to administer ERISA. *See* 29 U.S.C. § 1204(a) ("Whenever in this chapter or in any provision of law amended by this chapter the Secretary of the Treasury and the Secretary of Labor are required to carry out provisions relating to the same subject matter (as determined by them) they shall consult with each other and shall develop rules, regulations, practices, and forms which . . . are designed to reduce . . . conflicting or overlapping

Under that definition, businesses are under "common control" if they are: (1) part of the same parent-subsidiary corporate structure; (2) majority-owned by the same group of five or fewer persons; or (3) a combination of (1) and (2).[33]

Reviewing the Fund's amended complaint, we find nothing to suggest that Penn Traffic and C&S satisfied any part of this regulatory definition for common control. In fact, the Fund does not plead that C&S and Penn Traffic had *any* common owners.[34]

On appeal, the Fund suggests that common control for the purposes of ERISA can be established by a "partnership-in-fact." Such a claim is without any basis in the caselaw of our Circuit, but the First Circuit has adopted an eight-part test from the jurisprudence of the United States Tax Court to determine whether such a "partnership-in-fact" exists and establishes common control under ERISA.[35] Even assuming, without deciding, that the law of the First Circuit is persuasive or applicable here, the Fund's claim would not succeed. The amended complaint's allegation that "C&S and Penn Traffic each

requirements . . . ."); *see also* Colleen E. Medill, Introduction to Employee Benefits Law: Policy and Practice 29–30 (5th ed. 2018) (explaining the division of authority between the Department of Labor, the Treasury Department, and the Pension Benefit Guaranty Corporation under ERISA).

[33] *See* 26 C.F.R. § 1.414(c)-2.

[34] *Cf.* App'x 36 (acknowledging the "technical separation in ownership between C&S and the Penn Traffic Company under state law"); *id.* at 38 ¶¶ 13–17.

[35] *See Sun Cap. Partners III, LP v. New Eng. Teamsters & Trucking Indus. Pension Fund*, 943 F.3d 49, 57–58 (1st Cir. 2019) (citing *Luna v. Comm'r*, 42 T.C. 1067, 1077–78 (1964)).

17

stood to realize a profit or loss" based on whether the Syracuse warehouse business was successful neither satisfies the First Circuit's test nor convinces us that a "partnership-in-fact" could have existed between these businesses.[36]

In sum, we agree with the District Court that the Fund has "not even remotely" pleaded facts that would sustain a claim under Section 1301(b).[37] The District Court was therefore correct to dismiss the "common control" count.

### D.    Employer Liability

Next, the Fund argues that C&S used its Logistics Agreement as a "subterfuge" to mask the fact that it was actually the "employer" of the Syracuse warehouse Teamsters, and that C&S is therefore subject to withdrawal liability.[38] This argument is before us in a somewhat unusual posture that requires analysis.

At the outset, it is important to distinguish this argument from the fourth count of the Fund's amended complaint. Under that count, the Fund argued that C&S was subject to withdrawal liability as an "employer" under the "joint employer" doctrine, and the District Court dismissed that count under Rule 12(b)(6) in its May 1, 2017

---

[36] *See* App'x 51 ¶ 95.

[37] Special App'x 23.

[38] Appellant's Br. 50-51.

18

order.[39] On appeal, the Fund abandons that argument and the associated count of its amended complaint.

By contrast, the Fund first articulated a version of its "subterfuge" argument in its opposition to C&S's motion for summary judgment. Therefore, on appeal, the "subterfuge" argument can only be properly understood as an appeal of some error made by the District Court in its summary judgment order of March 18, 2020, even though that order dealt only with the "successor" liability count of the amended complaint (the District Court having already dismissed the other three counts).[40] In effect, therefore, the Fund in its "subterfuge" argument attempts to shoe-horn an "employer" theory of liability (that might have been more appropriate under the dismissed and abandoned fourth count of the Fund's amended complaint, or under a separate count entirely) into its appeal of the District Court's treatment of the separate but sole-surviving first count of its amended complaint, *i.e.*, successor liability.

C&S therefore urges that the "subterfuge" argument is "new" and "forfeited."[41] We recognize instead that the argument *was* before the District Court at the summary judgment stage, albeit in an abbreviated and defensive form, rather than articulated—as it is on appeal—as an independent theory of C&S's withdrawal liability. Still, we have no problem rejecting the Fund's "subterfuge" theory of

---

[39] *Id.* at 23–26.

[40] *Id.* at 45.

[41] Appellee's Br. 50–51.

19

"employer" liability and finding that the District Court committed no error with regard to it.

Under the Logistics Agreement, C&S agreed to reimburse a portion of the costs—including a portion of the labor costs—Penn Traffic incurred on behalf of C&S as an independent contractor operating the Syracuse warehouse.[42] The Fund argues that this reimbursement contract was essentially a facade that allowed C&S to employ the Teamsters without doing so officially. Instead, in the Fund's view, Penn Traffic continued to act as the official employer, and C&S simply reimbursed Penn Traffic's costs—thereby reaping the benefits of the Teamsters' labor without having to assume the liabilities of formal employment (such as withdrawal liability). This argument relies on a single footnote in *Division 1181 A.T.U.-New York Employees Pension Fund By Cordiello v. City of New York Department of Education*. There, we opined:

> There may be cases in which a plaintiff seeking to recover withdrawal liability payments plausibly alleges that the defendant used reimbursement as a subterfuge to avoid accepting a contractual obligation to contribute. We do not foreclose the possibility that such allegations, if proven, could render the reimbursing entity an "employer" under the MPPAA.[43]

---

[42] Suppl. App'x 129–31.

[43] 910 F.3d 608, 616 n.4 (2d Cir. 2018).

Far from "holding" that a defendant is made an employer for the purpose of withdrawal liability by engaging in a so-called subterfuge reimbursement, in *Division 1181* we merely declined to foreclose that possibility.[44] We found such a holding unnecessary, because the plaintiffs in that case had not, in fact, shown any subterfuge.[45]

Just so here. The Fund submits that because agreements such as the Logistics Agreement were "not part of the ordinary course of C&S's business," the agreement was therefore the type of "subterfuge" contemplated in our *Division 1181* footnote.[46] This somewhat vague suggestion runs up against our *actual* holding in *Division 1181*, and solid caselaw from our sister circuits more broadly, that an obligation to reimburse an independent contractor for contributions to a pension plan is not the same as an obligation to contribute directly to that plan: "[R]eimbursement and contribution are distinct concepts under the MPPAA" and therefore "no obligation to contribute" to a multiemployer pension plan "aris[es] under . . . contracts" that require non-employers to reimburse an employer's contributions under such a plan.[47]

---

[44] *Compare id. with* Appellant's Br. 51.

[45] *See Div. 1181*, 910 F.3d at 616 n.4.

[46] Appellant's Br. 51.

[47] *Div. 1181*, 910 F.3d at 616–17; *accord Transpersonnel, Inc. v. Roadway Exp., Inc.*, 422 F.3d 456, 461 (7th Cir. 2005) ("[T]he obligation to *reimburse* for contributions made by another is not the equivalent of an obligation

C&S entered into a well-recognized form of contractual agreement in which C&S reimbursed Penn Traffic for certain expenses that Penn Traffic incurred as an independent contractor operating the Syracuse warehouse. The fact of a reimbursement arrangement alone—even for a company that may not frequently enter into such arrangements—does not a "subterfuge" make.

Is sum, the Fund failed to allege that C&S was an "employer" based on its "subterfuge" theory, and the District Court committed no error in this regard.

### E.    Successor Liability

The Fund's final theory of liability is that, based on its acquisition of Penn Traffic's wholesale and distribution business, C&S was the "successor" to Penn Traffic and therefore C&S assumed Penn Traffic's withdrawal liability. In allowing this theory to proceed past the motion-to-dismiss stage, the District Court held that successor liability could apply to withdrawal liability under ERISA.

Having never explicitly addressed that question ourselves, we examine successor liability and its application to withdrawal liability prior to turning back to the circumstances of the instant case.

---

to *contribute* in the first instance, and this distinction is important for purposes of [the] definition of 'employer' under the MPPAA.").

### 1. Successor Liability Generally

Under the general common law rule, "a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities."[48] However, the Supreme Court has "imposed liability upon successors beyond the bounds of the common law rule in a number of different employment-related contexts in order to vindicate important federal statutory policies."[49] The Supreme Court has held, for example, that a "successor employer may be required to arbitrate with [a] union" under a predecessor's CBA,[50] or may be held liable for a "predecessor employer's unfair labor practices" under the National Labor Relations Act ("NLRA").[51] Federal courts have further expanded the boundaries of "successor liability" to include other federal statutory schemes, such as ERISA,[52]

---

[48] *Stotter Div. of Graduate Plastics Co. v. Dist. 65*, 991 F.2d 997, 1002 (2d Cir. 1993) (internal quotation marks omitted).

[49] *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1326 (7th Cir. 1990).

[50] *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 548 (1964).

[51] *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 184 (1973); *see also Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27 (1987).

[52] *See, e.g., Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1093–95 (9th Cir. 2015); *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 99 (3d Cir. 2011); *Artistic Furniture*, 920 F.2d at 1327.

the Fair Labor Standards Act,[53] the Family and Medical Leave Act,[54] and Title VII of the Civil Rights Act of 1964,[55] among others.[56]

Successor liability is thus a "deviation" from the general common law rule.[57] In fashioning this body of law, federal courts have attempted to "strik[e] a balance between the conflicting legitimate interests of the . . . successor, the public, and the affected employee[s]."[58] In other words, "[s]uccessor liability is an equitable doctrine, not an inflexible command."[59] The Supreme Court has therefore emphasized that there is "no single definition of 'successor' which is applicable in every legal context," and that the question of whether to hold a new employer to the obligations of a former

---

[53] *See, e.g., Teed v. Thomas & Betts Power Sols., LLC*, 711 F.3d 763, 766–77 (7th Cir. 2013); *Steinbach v. Hubbard*, 51 F.3d 843, 845 (9th Cir. 1995).

[54] *See, e.g., Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 781 (9th Cir. 2010).

[55] *See, e.g., Bates v. Pac. Maritime Ass'n*, 744 F.2d 705, 708 (9th Cir. 1984).

[56] *See, e.g., Scalia v. Wynnewood Refin. Co.*, 978 F.3d 1175, 1184 (10th Cir. 2020) (Occupational Safety and Health Act); *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 747–48 (7th Cir. 1994) (Age Discrimination in Employment Act); *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 748–50 (7th Cir. 1985) (race-based employment discrimination under 42 U.S.C. § 1981).

[57] *New York v. Nat'l Servs. Indus., Inc.*, 352 F.3d 682, 688 (2d Cir. 2003) (Leval, J., concurring).

[58] *Golden State Bottling*, 414 U.S. at 181.

[59] *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995).

employer is one that must be considered "in light of the facts of each case and the particular legal obligation which is at issue."[60]

In the cases where we have found it appropriate to impose successor liability, we have held that (1) a successor must have notice of its predecessor's liability, and (2) there must be "substantial continuity of identity in the business enterprise."[61] Other circuits have employed similar formulations.[62]

The Supreme Court has said that factors to consider in order to establish "substantial continuity" include:

> whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity

---

[60] *Howard Johnson Co. v. Detroit Loc. Joint Exec. Bd.*, 417 U.S. 249, 263 n.9 (1974).

[61] *See, e.g., Stotter*, 991 F.2d at 1001 (quoting *Wiley*, 376 U.S. at 551); *see also Golden State Bottling*, 414 U.S. at 185 ("[A] successor must have notice before liability can be imposed . . . .").

[62] *Ind. Elec. Workers Pension Benefit Fund v. ManWeb Servs., Inc.*, 884 F.3d 770, 777 (7th Cir. 2018) ("Successor liability under the MPPAA requires two distinct components: notice of the potential liability and substantial continuity of the business."); *Resilient Floor*, 801 F.3d at 1095 ("[A] bona fide successor can be liable . . . so long as the successor had notice of the liability."); *Einhorn*, 632 F.3d at 99 (purchaser of assets may be liable "where the buyer had notice of the liability prior to the sale and there exists sufficient evidence of continuity of operations between the buyer and seller").

has the same production process, produces the same products, and basically has the same body of customers.[63]

However, the Courts of Appeals have grouped these considerations slightly differently,[64] or emphasized certain factors more than others, depending on the statutory scheme to be vindicated and the circumstances of the case.[65]

In other words, "the concept of substantial continuity" is not "satisfied in the same way in each circumstance," and "the test developed for one statute differs from the test developed for another."[66] Ultimately, the question of whether there is substantial

---

[63] *Fall River Dyeing*, 482 U.S. at 43; *see Proxy Commc'ns of Manhattan, Inc. v. NLRB*, 873 F.2d 552, 554 (2d Cir. 1989) (per curiam).

[64] *Compare, e.g.*, *Resilient Floor*, 801 F.3d at 1090–91 ("Whether there has been a substantial continuity of the same business operations; whether the new employer uses the same plant; whether the same or substantially the same work force is employed; whether the same jobs exist under the same working conditions; whether the same supervisors are employed; whether the same machinery, equipment, and methods of production are used; and whether the same product is manufactured or the same service is offered." (cleaned up)), *with Einhorn*, 632 F.3d at 99 ("Under the substantial continuity test courts look to, *inter alia*, the following factors: continuity of the workforce, management, equipment and location; completion of work orders begun by the predecessor; and constancy of customers.").

[65] *See, e.g.*, *Resilient Floor*, 801 F.3d at 1096 (explaining that certain "factors are more relevant to NLRA contexts than to the MPPAA withdrawal liability context," and therefore weighting factors differently).

[66] *Nat'l Servs. Indus.*, 352 F.3d at 688 (Leval, *J.*, concurring); *accord Resilient Floor*, 801 F.3d at 1093 ("[T]he cases that have considered in various labor and employment law contexts whether an employer is a successor have tailored their

continuity between a predecessor and a successor "is primarily factual in nature and is based upon the totality of the circumstances of a given situation."[67]

As the Supreme Court itself has indicated, this factual focus is "especially appropriate" given the "difficulty" of the successorship doctrine and "the absence of congressional guidance as to its resolution."[68]

Therefore, some caution is appropriate when faced with a decision—as we are in the instant case—as to whether the doctrine is properly applied in a new context.

### 2. *Successor Liability for ERISA Withdrawal Liability*

We have previously applied successor liability to delinquent pension fund contributions under ERISA. In *Stotter Division of Graduate Plastics Co. v. District 65*,[69] we considered the purchase of the assets of one plastic goods manufacturer ("Stotter") by another ("GPC"). Stotter had been obligated to make contributions to a union pension plan on behalf of its employees. Stotter fell behind on its contributions, and the union representing its employees commenced an arbitration. As the arbitration was pending, GPC purchased Stotter, and the arbitration

---

analyses to the particular policy concerns underlying the applicable statute and to the particular claim. The successorship standards are flexible and must be tailored to the circumstances at hand.").

[67] *Fall River Dyeing*, 482 U.S. at 43.

[68] *Howard Johnson*, 417 U.S. at 256.

[69] 991 F.2d 997 (2d Cir. 1993).

resulted in an award for the union that the arbitrator ruled was enforceable against GPC as Stotter's successor.[70] The district court applied the Supreme Court's decision in *John Wiley & Sons, Inc. v. Livingston*,[71] which held that an arbitration provision in a predecessor's CBA was enforceable against a successor where there was "substantial continuity of identity in the business enterprise."[72] The district court held that successor liability had therefore been properly applied to Stotter's delinquent ERISA contributions, and we affirmed.[73]

In doing so, we noted the "substantial continuity of Stotter's operations under GPC" and concluded that the arbitrator had correctly "impos[ed] liability for the contribution delinquencies" on GPC.[74]

To be sure, the facts presented in *Stotter* differ from those presented here. Most importantly, and as C&S emphasizes, GPC had agreed to be bound by Stotter's CBA.[75] Still, the logic of *Stotter* rested on *Wiley*, in which the successor had *not* agreed to be bound by the predecessor's CBA—indeed, *Wiley* stands for the very proposition that a successor "which *did not itself sign* the collective bargaining agreement on which [a] [u]nion's claim to arbitration depends" can

---

[70] *Id.* at 998–99.

[71] 376 U.S. 543 (1964).

[72] *Id.* at 551.

[73] *Stotter*, 991 F.2d at 1000, 1002–03.

[74] *Id.* at 1002–03.

[75] *Id.* at 999.

still be "bound" by that arbitration provision.[76] Based on *Stotter*, at a minimum, we are confident that ERISA is precisely the sort of statute—embodying the sort of federal labor relations policy goals—to which the successor liability doctrine can legitimately apply.

But we have never held that successor liability can be applied to *withdrawal liability* under ERISA. Both the Seventh and Ninth Circuits have considered that question squarely, and both have concluded that it can.[77]

Both of those circuits had, themselves, previously applied the doctrine to delinquent ERISA contributions,[78] and neither saw any reason not to apply the same rule to withdrawal liability as well. As the Ninth Circuit explained:

> We see no reason why the successorship doctrine should not apply to MPPAA withdrawal liability just as it does to the obligation to make delinquent ERISA contributions. The primary reason for making a successor responsible for its predecessor's delinquent ERISA contributions is that, "absent the imposition of successor liability, present and future employer

---

[76] *Wiley*, 376 U.S. at 547 (emphasis added).

[77] *See Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 845–47 (7th Cir. 2015); *Resilient Floor*, 801 F.3d at 1093–95.

[78] *See Artistic Furniture*, 920 F.2d at 1327; *Trs. for Alaska Laborers-Constr. Indus. Health & Sec. Fund v. Ferrell*, 812 F.2d 512, 516 (9th Cir. 1987); *see also Einhorn*, 632 F.3d at 99 (same).

participants in the union pension plan will bear the burden of the predecessor's failure to pay its share," which will threaten the health of the plan while the successor reaps a windfall. That rationale applies with equal, if not greater, force to a predecessor's MPPAA withdrawal liability.[79]

Relying on our decision in *Stotter* and persuaded by the rationale of *Resilient Floor*, the District Court, in its May 1, 2017 order, held that "the theory of successor liability is applicable to withdrawal liability under ERISA."[80] We agree.

On appeal, C&S argues that 29 U.S.C. § 1384 demonstrates that successor liability ought not extend to withdrawal liability. That section provides that, under certain conditions, a seller-employer does not incur withdrawal liability "as a result of a . . . sale of assets to an unrelated party."[81] In other words, Section 1384 "protect[s] an employer from withdrawal liability with respect to a sale of assets that meets certain requirements."[82]

But those requirements are all "designed to shift the obligation for contributions to the purchaser while leaving the seller secondarily

---

[79] *Resilient Floor*, 801 F.3d at 1093–94 (alterations omitted) (quoting *Artistic Furniture*, 920 F.2d at 1328).

[80] Special App'x 10.

[81] 29 U.S.C. § 1384(a)(1).

[82] *Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Cullum Cos.*, 973 F.2d 1333, 1337 (7th Cir. 1992) (citation omitted).

liable."[83] That is, *sellers* are protected from withdrawal liability by the statute if their purchasers effectively assume responsibility for contributing to the plan themselves. But that does not mean that, under Section 1384, *purchasers* can *only* assume that liability "by consent" as C&S suggests.[84] Rather, if purchasers find a way to *not* assume withdrawal liability pursuant to the terms of the asset sale—but they do, in fact, qualify as successors under the substantial continuity doctrine—they may still be liable.[85]

More theoretically, C&S urges that the extension of successor liability to withdrawal liability is the sort of federal common lawmaking prohibited by *United States v. Bestfoods*,[86] and analogous to our now-overruled decision in *BF Goodrich v. Betkoski*,[87] which extended the doctrine of successor liability to the Comprehensive

---

[83] *Id.* (citation omitted).

[84] Appellee's Br. 43.

[85] Likewise inapposite is the specific case covered by § 1384(a)(1)(C), in which the purchaser subsequently withdraws from the plan, triggering the seller's secondary liability. While this is "one circumstance in which a[] [purchaser] employer who might . . . otherwise fit into the successor category is not liable for withdrawal payments," in that case the liability would shift back to the seller, and such a scenario therefore "does not address whether the broader employment and labor law successorship doctrine applies where those stringent conditions are not met." *Resilient Floor*, 801 F.3d at 1094 (emphasis omitted).

[86] 524 U.S. 51 (1998).

[87] 99 F.3d 505 (2d Cir. 1996).

Environmental Response, Compensation, and Liability Act of 1980 (CERCLA).[88]

Following *Bestfoods*'s holding that CERCLA did not displace common law principles regarding a parent corporation's liability for the actions of its subsidiary, and its admonition that "to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law,"[89] we overruled *Betkoski* in *New York v. National Services Industries, Inc.*[90]

But *National Services* is easily distinguishable. There, the question was "whether, in *the context of CERCLA*, the substantial continuity rule for successor liability" could apply to liability for environmental harms.[91] We held that while "the substantial continuity doctrine is well established in the area of labor law," the doctrine did not apply "*for CERCLA purposes*."[92] In other words, both *Bestfoods* and *National Services* concerned CERCLA specifically. They did not purport to address or undermine the concept of successor liability in the labor law context.

Despite C&S's suggestions to the contrary, the successor liability doctrine is not limited to the NLRA or collective bargaining *per se*. The Supreme Court has never suggested as much, and multiple authorities

---

[88] *Id.* at 518–20.

[89] 524 U.S. at 63 (internal quotation marks omitted).

[90] 352 F.3d 682, 685 (2d Cir. 2003).

[91] *Id.* at 684 (emphasis added).

[92] *Id.* at 686, 687 (emphasis added).

demonstrate the opposite.[93] ERISA, too, effects the goals of federal labor policy. It is therefore part of the labor law context in which successor liability originates, and into which it can be carefully yet confidently extended.[94]

C&S's warnings of a "potential policy catastrophe" that will "wreak havoc on the free flow of capital"[95]—while raising an important issue worth considering in *any* decision to broaden successor liability—are ultimately unpersuasive in this instance. As the instant case demonstrates (and as we explain below), just because successor liability *can* apply to withdrawal liability does not mean that any asset purchaser qualifies as a successor under the substantial continuity doctrine. To the contrary, a finding of substantial continuity depends on a circumstance-specific inquiry.

### 3. *Successor Liability Analysis for C&S and Penn Traffic*

In a tightly reasoned and thorough opinion, the District Court entered summary judgment for C&S on the successor liability count of the Fund's amended complaint, holding that C&S "did not substantially continue Penn Traffic's business after the 2008 transaction."[96] We easily agree with this conclusion.

---

[93] *See supra* notes 51–55.

[94] *Cf. Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 377 (2002) ("Congress intended a 'federal common law of rights and obligations' to develop under ERISA . . . ." (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987)).

[95] Appellee's Br. 46–47.

[96] Special App'x 53 (emphasis omitted).

Again, the proper substantial continuity analysis takes its general shape from the Supreme Court's guidance:

> [T]he focus is on . . . whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.[97]

The substantial continuity doctrine is applied most comfortably when a purchaser *acquires* the assets of a seller—not when a purchaser *fails to acquire* those assets. The latter situation in this case forces the Fund to argue elliptically for each continuity factor, essentially asking us (as it has, in different forms, for all its theories of liability) to disregard Penn Traffic's continued existence as C&S's independent contractor following the 2008 transaction. The result is that while the factors in the substantial continuity analysis are the same, the framing of our analysis differs from the standard case where a purchaser acquires the assets of a seller. The relevant questions become, for example, whether C&S acquired Penn Traffic's Syracuse warehouse employees and customers, not whether Penn Traffic's Syracuse warehouse employees and customers remained the same.

The District Court undertook this analysis in three parts (workforce and management, customers, and facilities and

---

[97] *Fall River Dyeing*, 482 U.S. at 43.

equipment), which was appropriate and useful "in light of the facts of [the] case and the particular legal obligation . . . at issue."[98]

In our review, even construing all the facts in favor of the Fund as we are required to do, one overriding fact is ultimately decisive: *C&S did not purchase the Syracuse warehouse or employ the Union members who worked there*. Penn Traffic continued to own the warehouse and employ the Union members.[99]

As to the continuity of workforce and management, the record demonstrates that C&S did not acquire *any* of the relevant Union employees from Penn Traffic (because they remained employed by Penn Traffic). Similarly, as to the continuity of facilities and equipment, C&S did not acquire the Syracuse warehouse or the equipment there. And as to the continuity of customers, it is enough to note—and Penn Traffic does not materially dispute—that about 70% of the volume of product distributed by Penn Traffic from the Syracuse warehouse was to Penn Traffic's own retail stores, not to the wholesale

---

[98] *Howard Johnson*, 417 U.S. at 262 n.9. Other circuits have enumerated substantial continuity factors in "cleaner" lists. *See, e.g.*, *Leib v. Ga.-Pac. Corp.*, 925 F.2d 240, 247 (8th Cir. 1991) (enumerating a seven-factor test); *United States v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir. 1992) (enumerating an eight-factor test). We decline to do so here, lest such a formulation be confused as a definitive "substantial continuity test" in our Circuit. On the contrary, unless the Supreme Court itself or the Congress speak more definitively on substantial continuity, in our view the concept must continue to be "flexible" and "tailored to the circumstances at hand." *Resilient Floor*, 801 F.3d at 1093.

[99] App'x 465–66 ¶¶ 21–22; Suppl. App'x 126, 144.

customers acquired by C&S.[100] This is a large enough majority, for the purpose of a *substantial* continuity analysis, to tip the customer continuity question in C&S's favor. In other words, given the structure of the 2008 transaction, we agree with the District Court's conclusion that C&S did not "substantially continue" Penn Traffic's business.

None of the Fund's arguments on appeal upset this conclusion.

The Fund's cited authorities concerning workforce continuity amount to the argument that a change in workforce *alone* does not automatically defeat successor liability.[101] This is true. After all, substantial continuity is established through a multifactor analysis. But this certainly does not somehow transform a change in workforce into a factor weighing *in favor* of finding substantial continuity.

The Fund's argument that the warehouse's inventory—owned by C&S—should be considered "facilities and equipment" for the purposes of establishing substantial continuity, is also unconvincing. Clearly, in assessing continuity in a grocery warehousing business, the more appropriate consideration is who owns the warehouse itself (in this case, a third party, but leased by Penn Traffic),[102] and who owns the forklifts and other warehousing equipment (Penn Traffic itself),[103]

---

[100] Appellant's Br. 43; Appellee's Br. 8; App'x 461 ¶ 7, 469 ¶ 32.

[101] *See* Appellant's Br. 39–42.

[102] App'x 463 ¶ 15

[103] *Id.* at 467 ¶ 28. That the Supreme Court in *Fall River Dyeing* appeared to consider a successor's partial possession of a predecessor's inventory as one factor in a successorship analysis, *see* 482 U.S. at 32, again, only indicates that inventory

not who owns the crates of groceries passing through the warehouse bound for retail.

Finally, even if, as the Fund suggests, 30% of the customers receiving groceries from the warehouse were, after the 2008 transaction, buying those groceries from C&S, this does not tip the balance back towards substantial continuity. Penn Traffic was still performing the *warehousing and distribution* of C&S's groceries for those customers, which is the relevant "business" to consider with reference to the Syracuse warehouse and its Union employees.[104]

In sum, then, C&S did not take over any significant part of—much less "substantially continue"—Penn Traffic's relevant business: the Syracuse warehouse or the employment of its Union employees.[105] C&S therefore is not subject to Penn Traffic's withdrawal liability under a theory of successor liability.

---

might be one factor considered in a multifactor analysis, depending on the particularities of a given case. It does not upset our conclusion here.

[104] We likewise reject the Fund's argument that C&S succeeded Penn Traffic because it acquired as customers Penn Traffic's retail stores that were sold to Tops (a Penn Traffic competitor) in bankruptcy. Given the totality of the circumstances, we find decisive that the Fund has adduced no evidence that these retail stores were served out of the Syracuse warehouse, which was closed in 2010 after Penn Traffic's bankruptcy. *Cf. Proxy Commc'ns*, 873 F.2d at 554 (identifying successorship where the successor "provided the same services . . . from the same location and for the same customers").

[105] We need not address the important requirement that a successor must have notice of a predecessor's liability, as the substantial continuity analysis decides the question in this case.

## III. CONCLUSION

To summarize, we hold as follows:

(1) the District Court did not err in dismissing the Fund's "evade-or-avoid" liability theory;

(2) the District Court did not err in dismissing the Fund's "common control" liability theory;

(3) the District Court did not err in finding that C&S was not an "employer" of the Union employees at the Syracuse warehouse; and

(4) "successor liability" can, as a matter of law, apply to withdrawal liability under ERISA, but

(5) the District Court in this case did not err in granting C&S's motion for summary judgment because C&S did not substantially continue Penn Traffic's relevant business, and therefore was not subject to "successor liability."

For the foregoing reasons, we **AFFIRM** the District Court's May 1, 2017 order and its March 18, 2020 judgment.